**Mildred IVES et al.,
Plaintiffs-Appellees,**

v.

**W. T. GRANT COMPANY,
Defendant-Appellant.**

**No. 462, Docket 74–2131.**

United States Court of Appeals,
Second Circuit.

Argued March 11, 1975.

Last brief submitted April 18, 1975.

Decided July 31, 1975.

William J. Egan, New Haven, Conn. (Wiggin & Dana; J. Michael Eisner, David A. Reif, New Haven, Conn., on the brief), for defendant-appellant.

William H. Clendenen, Jr., New Haven, Conn. (Clendenen & Lesser, David M. Lesser, New Haven, Conn.; Zeldes, Needle & Cooper, Stuart Bear, Bridgeport, Conn., on the brief), for plaintiffs-appellees.

John Nicoll, Deputy Gen. Counsel; D. Edwin Schmelzer, Chief Atty., Fair Credit Practices; Mark S. Medvin, Atty., Fair Credit Practices, Federal Reserve System, as amicus curiae.

Before LUMBARD, MOORE and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

W. T. Grant Company (Grants) appeals from an order of the United States District Court for the District of Connecticut, Jon O. Newman, *J.,* granting plaintiffs' motion for partial summary judgment, including injunctive relief, in this action alleging violations of the Connecticut Truth-in-Lending Act, C.G.S.A. § 36–393 et seq., and the Connecticut usury laws, C.G.S.A. §§ 37–4, 36–243.[1] Plaintiffs are three residents of Connecticut, suing on behalf of themselves and others similarly situated. The lawsuit is a broad-scale attack on Grants' coupon book credit plan, which has also been the subject of extensive litigation in other jurisdictions.[2]

The court below decided that it had jurisdiction over these state law claims. Then it turned to the merits of the Grants coupon plan, which it described as follows:

> [A] customer obtains a book or books of coupons which in turn may be exchanged for merchandise sold by defendant; the coupon books have varying total values of $10.00, $25.00, $50.00, $100.00 or $200.00, and the coupons may be either exchanged for merchandise at any time or returned for a cash refund. When acquiring a

---

1. The district judge, in effect, affirmed on the opinion of Magistrate Arthur H. Latimer.

2. *Rathbun v. W. T. Grant Co.,* 219 N.W.2d 641 (Minn.Sup.Ct.1974); *Welmaker v. W. T. Grant Co.,* 365 F.Supp. 531 (N.D.Ga.1972); *State v.*

*W. T. Grant Co.,* CCH Consumer Credit Guide ¶¶ 99,135, 99,146 (Wisc.Cir.Ct.1972) (1969–1973 Transfer Binder); *W. T. Grant Co. v. Walsh,* 241 A.2d 46 (N.J.Dist.Ct.1968).

coupon book for the first time or reopening a coupon account, like plaintiff Joyce Chapman, a customer executes a form retail installment sales contract, generally labelled a "new and reopened" account agreement, which sets forth the transaction's terms and basically obligates the customer-debtor to pay in monthly installments a total sum consisting of the face value of the coupon book, any attendant credit insurance charges, and finance charges computed on the coupon book's value and any such insurance charges. The monthly installment payment is ordinarily set at the outset at a figure which would result in a paid-up account within twenty-four to thirty months. Prior to January 1, 1971, the customer's obligation to pay accrued immediately upon entry into the installment contract; thereafter, as in plaintiff Joyce Chapman's case, the obligation has been triggered by the first exchange of a coupon for merchandise, although the monthly payment obligation which then accrues is based on the full contract amount without regard to the amount of the first actual coupon-merchandise exchange or to the actual period of time over which the coupons are used.

If the debtor chooses to acquire additional coupon books while the original account is still outstanding, like plaintiffs Mildred Ives and Moira Robertson, a substituted "add-on" form installment sales contract is signed. Typically, the prior contract balance (less an unearned finance charge rebate), plus the sum of the new coupons issued (together with any new insurance charges), constitute an amount on which a new overall finance charge is assessed, and the grand total is again made payable in monthly installments, with the first payment due thirty days from the add-on contract's execution—again without regard to any actual use or rate of use of the new coupons. The court held that the contracts used for the plan violated the Truth-in-Lending law in five ways: (1) the term "amount financed" was used instead of "unpaid balance"; (2) the finance charge was not clearly disclosed in the add-on contract; (3) non-rebated insurance premiums were not disclosed; (4) the finance charge was not properly itemized; and (5) the effect of a claimed security interest was not properly explained. The court also found a violation of state usury laws because Grants' interest rate of over 19 per cent exceeded the legal 12 per cent limit of C.G.S.A. §§ 37–4, 36–243. On appeal, Grants raises a jurisdictional issue and a host of defenses to these charges. We affirm.

I. Jurisdiction

Grants first challenges the jurisdiction of the district court. The court below held it had jurisdiction over these state law claims by virtue of the federal Truth in Lending Act, 15 U.S.C.A. §§ 1601–65, particularly 15 U.S.C. § 1640(e) and 12 C.F.R. § 226.12(c). Grants' position is that absent diversity only the Connecticut state courts may hear these claims and thus the case should be remanded to examine whether diversity jurisdiction exists.[3] Since resolution of this issue depends in large part on the validity of regulations issued by the Federal Reserve Board, we asked for, and received, a brief stating the Board's position on the question.

After many years of congressional consideration, the federal Truth in Lending Act was passed in 1968 as Title I of the Consumer Credit Protection Act.[4]

---

**3.** Cf. *Givens v. W. T. Grant Co.*, 457 F.2d 612 (2d Cir.), vacated, 409 U.S. 56, 93 S.Ct. 451, 34 L.Ed.2d 266, modified, 2 Cir., 472 F.2d 1039 (1972).

**4.** Warren & Larmore, Truth in Lending: Problems of Coverage, 24 Stan.L.Rev. 793 (1972); Note, Truth in Lending: The Impossible Dream, 22 Case W.Res.L.Rev. 89, 90–91 n.8 (1970). For the attentive reader who may notice the appearance and disappearance of hyphens in referring to truth in lending laws, we note that the short title of the Connecticut law contains hyphens, C.G.S.A. § 36–416, but the short title of the federal law does not, see § 101 of the Consumer Credit Protection Act,

Administrative enforcement is divided among various agencies of the federal government, but the Federal Reserve Board was directed to "prescribe regulations to carry out the purposes of" the Act, and these regulations were to provide for such "exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [the Act] . . . or to facilitate compliance therewith." 15 U.S.C. § 1604. Also, 15 U.S.C. § 1633 provides that:

> The Board shall by regulation exempt from the requirements of this part [15 U.S.C. §§ 1631–44] any class of credit transactions within any State if it determines that under the law of that State that class of transactions is subject to requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement.

The jurisdictional problem in this case arises out the Board's power to grant exemptions.

In 1970, pursuant to section 1633, the Board granted Connecticut an exemption from the federal law with an important caveat:

> Except as provided in [12 C.F.R.] § 226.12(c), all classes of credit transactions within the State of Connecticut are hereby granted an exemption from the requirements of Chapter 2 of the Truth in Lending Act [15 U.S.C. §§ 1631–42] . . ..

12 C.F.R. § 226.12 Supplement III(e), 35 Fed.Reg. 11992 (July 25, 1970). 12 C.F.R. § 226.12(c), referred to in the Board's exemption, provides:

*Civil liability.* In order to assure that the concurrent jurisdiction of Federal and State courts created in section 130(e) of the Act [15 U.S.C. § 1640(e)] shall continue to have substantive provisions to which such jurisdiction shall apply, and generally to aid in implementing the Act with respect to any class of transactions exempted pursuant to paragraph (a) of this section and Supplement II, the Board pursuant to sections 105 [15 U.S.C. § 1604] and 123 [15 U.S.C. § 1633] hereby prescribes that:

(1) No such exemption shall be deemed to extend to the civil liability provisions of sections 130 [15 U.S.C. § 1640] and 131 [15 U.S.C. § 1641]; and

(2) After an exemption has been granted, the disclosure requirements of the applicable State law shall constitute the disclosure requirements of this Act, except to the extent that such State law imposes disclosure requirements not imposed by this Act. Information required under such State law with the exception of those provisions which impose disclosure requirements not imposed by this Act shall, accordingly, constitute the "information required under this chapter" (Chapter 2 of the Act) for the purpose of section 130(a) [15 U.S.C. § 1640(a)].

According to this Regulation, as a result of the exemption, "the disclosure requirements" of the Connecticut law became "the disclosure requirements" of the federal Act.[5] In addition, under 15 U.S.C. § 1640, relevant sections of which are quoted in the margin,[6] federal courts

---

Pub.L.No.90–321, U.S.Code Cong. & Admin. News, 90th Cong., 2d Sess.1968, at p. 176. In this opinion, an attempt has been made to adhere to this distinction.

**5.** For the purpose of this discussion, we put to one side any requirements imposed by state law but not by the federal Act.

**6.** Section 1640 has been recently amended and now provides in part:

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this chapter or chapter 4 of this title with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of the failure;

(2)(A) in the case of an individual action twice the amount of any finance charge in connection with the transaction, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; or

continue to have jurisdiction over any civil suit claiming violation of Connecticut disclosure requirements.

Grants vigorously contests the Board's power to create this "limited" exemption. It asserts that the purpose of 15 U.S.C. § 1633 was to remove totally any federal involvement in consumer credit transactions in exempted states. To this end Grants cites legislative history indicating that the exemptions were designed so that:

> [A]s state legislatures promulgate disclosure statutes which are substantially as protective as the federal Truth-in-Lending Act, increasing numbers of credit transactions would be exempted from coverage under the federal law. Federal involvement in the area would subsequently diminish and assume a secondary position, leaving primary truth-in-lending responsibility to the states.

Hearings on S. 5 Before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess. 452 (1967) (Memorandum of the General Counsel of the Treasury submitted at the request of Subcommittee Chairman Proxmire). See also id. at 666, 677, and 681 (Statement of Governor Robertson, Vice Chairman of the Federal Reserve Board), id. at 281; S.Rep.No.392, 90th Cong., 1st Sess. 21, 24 (1967); 113 Cong.Rec. 18409 (July 11, 1967) (statement of Senator Bennett), and id. at 18413 (statement of Senator McIntyre). We agree that the drafters of the federal law hoped that federal interference in consumer credit regulation would soon diminish as the states passed similar legislation, but we do not agree that this meant that federal court jurisdiction was to be eliminated.

To see why this is so, brief examination of the relevant federal and Connecticut laws is necessary. Enforcement of the requirements of federal Truth in Lending is achieved principally as follows: By 15 U.S.C. §§ 1604 and 1607 the Federal Reserve Board is empowered to promulgate regulations for Truth in Lending, the Federal Trade Commission is designated as the overall enforcing agency, and other federal agencies are assigned specific functions.[7] As the chief enforcing agency, the Federal Trade Commission is given the same powers for Truth in Lending as it possesses under the Federal Trade Commission Act, 15 U.S.C. § 1607(c). This means, in part, that it can hold hearings and issue cease and desist orders if viola-

---

(B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery in such action shall not be more than the lesser of $100,000 or 1 per centum of the net worth of the creditor; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

In determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

.     .     .     .     .

(e) Any action under this section may be brought in any United States district court or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

.     .     .     .     .

(g) The multiple failure to disclose to any person any information required under this chapter to be disclosed in connection with a single account under an open end consumer credit plan, other single consumer credit sale, consumer loan, or other extension of consumer credit, shall entitle the person to a single recovery under this section but continued failure to disclose after a recovery has been granted shall give rise to additional recoveries.

See §§ 407, 408 of Pub.L.No.93–495, 1 U.S. Code Cong. & Admin.News, 93d Cong., 2d Sess.1974, at pp. 1745–46.

7. 15 U.S.C. § 1607(a) gives specific responsibility to certain federal agencies in their respective areas of expertise. All other enforcement activity is delegated to the Federal Trade Commission by § 1607(c).

tions of the law are discovered. These and related enforcement provisions can be characterized as "administrative" remedies—that is, they require some active intervention by a governmental agency to institute proceedings. The federal law also allows for private enforcement through the civil liability provisions of 15 U.S.C. § 1640. See note 6 supra. This enables a debtor to recover damages for violation of the disclosure requirements of the law. Section 1640 provides for federal court jurisdiction over civil actions and prescribes some rules concerning them, but in no way requires any other federal involvement.

Connecticut has similarly structured its Truth-in-Lending law. Enforcement by the state bank commissioner is mandated by C.G.S.A. § 36–414. The commissioner is authorized to hold hearings, issue cease and desist orders, request injunctions, require and examine creditors' records, and provide general counseling and education services to promote the law's ends. On the other hand, C.G.S.A. § 36–407, allows for private civil actions by debtors who believe that the requirements of the Connecticut law have not been followed. Thus under Connecticut law, as under federal law, there is a division between what might be called administrative, or state-initiated, enforcement and private enforcement.

Given the two types of enforcement of truth in lending it is instructive to note what Congress thought the exemption provision in the federal law would do. Senator Bennett stated:

This provision not only eliminates any need for a new, vast Federal establishment to police the law, but it also preserves in a unique and practical way my original position that this law should be *administered* at the State level rather than at the Federal level. [Emphasis added.]

113 Cong.Rec. 18409. Thus it appears that the administration of Truth in Lending was to fall to the states. Prior to an exemption of credit transactions within a state, the Federal Reserve Board and the Federal Trade Commission have principal administrative authority. 15 U.S.C. §§ 1604, 1607. But as the states are exempted, local agencies analogous to the Board and Commission take over their watchdog roles, 113 Cong.Rec. 18409 (statement of Senator Bennett), and see that the law's requirements are administered properly. Indeed, 15 U.S.C. § 1633 expressly notes that it is the "requirements of this part [15 U.S.C. §§ 1631–44]" from which credit transactions shall be exempted.

But the civil liability section of the federal Truth in Lending law, 15 U.S.C. § 1640, is not a requirement, it is a remedy. As such, it was not intended to be eliminated by any exemption granted under section 1633. Congress apparently did not want federal agencies, such as the Federal Reserve Board and the Federal Trade Commission, to intrude upon the state's operation of its own truth in lending law if that law warranted the grant of an exemption. The limited exemption of Connecticut by the Board here insures that no such intrusion will occur—the Connecticut bank commissioner will be allowed to administer the state law as he sees fit. Federal court jurisdiction, on the other hand, is not the type of federal involvement that interferes with a state's control of its own law. Allowing state truth in lending suits to be heard in federal courts does not "cause State legislative and administrative bodies to give up one more of their responsibilities to a central government." 113 Cong.Rec. 18412 (statement of Senator Bennett).

Moreover, the undenied expertise of the Federal Reserve Board in matters concerning the federal law must be considered. We do not suggest that the Board has the power to expand or diminish the jurisdiction of the federal courts. Indeed, our view is exactly the opposite. But we do believe that the Board's interpretation of the federal statute, for which it has the responsibility for issuing regulations, is entitled to considerable deference. See *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356,

365–66, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *N. C. Freed Co. v. Board of Governors of the Federal Reserve System,* 473 F.2d 1210, 1217 (2d Cir.), cert. denied, 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973). In its amicus brief in this court the Board has pointed out the importance of private enforcement in the scheme of Truth in Lending.[8] In fact, while the law as finally enacted provides for federal administrative enforcement, the Senate version of the Act, Senate bill S. 5, contained no such provision. The Senate Report noted:

> The enforcement of the bill would be accomplished largely through the institution of civil actions. . . .
> The committee has not recommended investigative or enforcement machinery at the Federal level, largely on the assumption that the civil penalty section will secure substantial compliance with the act.

S.Rep.No.392, supra, at 9. Keeping in mind this emphasis on private enforcement, we believe that having a choice of forums—state or federal—can only ser . e to encourage civil actions to insure compliance.[9] Maintenance of a federal forum is particularly appropriate because of its often more liberal and modern procedures.[10] Therefore, we would be loath to overturn an administrative interpretation that retained that forum, made by the very agency charged with the interpretation of the statute. Thus, we agree with the position taken by the Board that the exemption granted to the State of Connecticut did not affect the jurisdiction of the court below to hear this suit under 15 U.S.C. § 1640.[11]

## II. Truth-in-Lending

Having established the existence of federal jurisdiction, we turn now to the substantive Truth-in-Lending violations found below. The court found that these violations generally involved use of the wrong terms in defendant's standard form coupon contract or improper disclosure of certain facts. For convenience, we attach as appendices A and B the relevant portions of Grants' blank forms, and as appendix C a portion of a form actually used by one of the plaintiffs.

### A. Failure to Use "Unpaid Balance."

The district court found that Grants' coupon contracts used "amount financed"[12] instead of the term "unpaid balance" prescribed by Connecticut Regulations (Conn.Regs.)[13] § 36–395–7(c)(5), cf. 12 C.F.R. § 226.8(c)(5),[14] and held that this constituted a violation of the Act. See also *Welmaker v. W. T. Grant Co.,* supra, 365 F.Supp. at 536–37. Grants first alleges that the "unintentional violation" defense of 15 U.S.C. § 1640(c),[15]

8. See also *Ratner v. Chemical Bank New York Trust Co.,* 329 F.Supp. 270, 280–81 (S.D.N.Y. 1971).

9. 15 U.S.C. § 1640(e) provides for both federal and state court jurisdiction. See note 6 supra.

10. The Board points out in its brief that if we were to hold this "partial" exemption invalid, it would be forced to examine state rules of procedure to see if remedies and methods available in federal court would be available in the state court as well. This might result in fewer exemptions being granted and would, at the very least, require the Board to acquire expertise in an area foreign to its normal function.

11. Because we hold that the federal court did have jurisdiction to hear the state law claims, we do not have to consider another question posed by the parties: If we held the Board's partial exemption invalid, would the entire exemption fail, leaving the federal law supreme and federal jurisdiction unchallenged; or would only the retention of federal jurisdiction fail, leaving the Connecticut law intact and requiring this suit to be brought in state court?

12. See item 7 of Appendices A and B.

13. These are regulations of the State of Connecticut, Banking Department, Disclosure of the Cost of Credit Regulations, Regulations of Connecticut State Agencies.

14. Whenever there is a federal counterpart to a Connecticut statute or regulation it will be indicated.

15. Although C.G.S.A. § 36–407(c) is substantially the same as § 1640(c), in this action in federal court the latter would apply in determining defendant's liability. 12 C.F.R. § 226.-12(c).

cf. C.G.S.A. § 36–407(c), is available to it. The section provides:

A creditor may not be held liable in any action brought under this section for a violation of this part if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

Grants argues that in using the term "amount financed" it relied on a Board pamphlet entitled "What you ought to know about Truth in Lending.[16] Therefore, Grants claims the benefit of section 1640(c) as a defense. See *Welmaker v. W. T. Grant Co.*, supra, 365 F.Supp. at 540–45, where Grants prevailed on this very issue. But see *Johnson v. Associates Finance, Inc.*, 369 F.Supp. 1121, 1123–24 (S.D.Ill.1974), and *Scott v. Liberty Finance Co.*, 380 F.Supp. 475, 479 (D.Neb.1974), where other defendants' reliance on the same pamphlet was to no avail. The "unintentional violation" provision has been the subject of substantial litigation and two different analyses have emerged. *Welmaker v. W. T. Grant Co.*, supra; *Rolader v. Georgia Power Co.*, 4 CCH Consumer Credit Guide ¶ 98,684 (N.D.Ga.1974); *Thrift Funds of Baton Rouge, Inc. v. Jones*, 274 So.2d 150, 161 (Sup.Ct.La.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); *Richardson v. Time Premium Co.*, CCH Consumer Credit Guide ¶ 99,272 (1969–1973 Transfer Binder) (S.D.Fla. 1971), have held that good faith efforts to comply with the legal requirements of the statute will excuse unintentional violations. Thus, Grants demands that it at least be granted a hearing on its good faith attempt to follow the law.

■ Plaintiffs dispute the bona fides of Grants' good faith efforts, noting that both the term "amount financed" and

the term "unpaid balance" are required by Conn.Reg. § 36–395–7(c)(5), cf. 12 C.F.R. § 226.8(c)(5), and Conn.Reg. § 36–395–7(c)(7), cf. 12 C.F.R. § 226.8(c)(7). Plaintiffs also rely on another line of cases, all of which follow the reasoning of *Ratner v. Chemical Bank New York Trust Co.*, supra, 329 F.Supp. at 281–82 & n. 17, in holding that the "unintentional violation" defense applies only to clerical errors of a sort that might occur in billing or in making mathematical calculations despite established "procedures reasonably adapted to avoid any such error." See *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1166–67 (7th Cir. 1974); *Palmer v. Wilson*, 502 F.2d 860, 861 (9th Cir. 1974); *Johnson v. Associates Finance, Inc.*, supra, 369 F.Supp. at 1123–24; *Scott v. Liberty Finance Co.*, supra, 380 F.Supp. at 480; *Owens v. Modern Loan Co.*, CCH Consumer Credit Guide ¶ 99,099 (1969–1973 Transfer Binder) (W.D.Ky.1972); *Douglas v. Beneficial Finance Co.*, 334 F.Supp. 1166, 1178 (D.Alaska 1971), rev'd on other grounds, 469 F.2d 453 (9th Cir. 1972); *Buford v. American Finance Co.*, 333 F.Supp. 1243, 1247–48 (N.D.Ga.1971). Finally, plaintiffs assert that good faith in the past is irrelevant since the order appealed from only enjoined Grants from entering into any coupon contracts in violation of the Truth-in-Lending law.

Defendant concedes that the unintentional violation defense does not apply to that portion of the district court's order providing for injunctive relief.[17] Defendant strongly objects to the district court's summary rejection of the defense, however, because of plaintiffs' pending motions for damages for past violations. We have carefully considered the question and have reviewed all of the arguments raised in the briefs as well as those discussed in the two lines of cases referred to above. We expressly adopt the reasoning of Judge Frankel

---

**16.** This pamphlet was issued in June 1969, well before the August, October and November 1971 contracts of plaintiffs here. In a sample form contained in the pamphlet, only the term "amount financed" is used.

**17.** Reply brief of defendant-appellant (defendant's first reply brief), at 12.

in *Ratner* and the cases that follow that decision. We hold that the "unintentional violation" defense of section 1640(c) is only available for clerical errors which occur despite a system for correcting them.

■■■ In its first reply brief, defendant calls to our attention the recent addition of subsection (f) to 15 U.S.C. § 1640. See section 406 of Pub.L.No.93–495, 1 U.S.Code Cong. & Admin.News, 93d Cong., 2d Sess.1974, at p. 1745. Subsection (f) provides:

No provision of this section or section 112 [15 U.S.C. § 1611] imposing liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board, notwithstanding that after such act or omission has occurred, such rule, regulation, or interpretation is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

By virtue of section 408(e) of the same Act, id. at p. 1746, subsection (f) applies to this action even though it is now in the appellate process. Defendant argues that we should construe the subsection broadly to include Board staff letters or pamphlets as providing a basis for the good faith defense. But this position was anticipated and expressly repudiated by the drafters:

The Truth in Lending Act is highly technical and the Committee does not believe a creditor should be forced to choose between the Board's construction of the Act and the creditor's own assessment of how a court may interpret the Act. Accordingly, the Committee recommends an amendment to Truth in Lending requested by the Board which would relieve a creditor of any civil liability under Truth in Lending for any act done or omitted in

good faith in conformity with any rule, regulation, or interpretation thereof by the Board. In order to confer immunity from civil liability, the rule, regulation, or interpretation thereof must be approved by the Board itself and not merely by the staff of the Board.[18]

Before the new "good faith" reliance provision was enacted, the Board noted:

One of the legitimate concerns of creditors who have attempted to comply in good faith with the requirements of Truth in Lending is that, although they have followed Regulation Z, a court may conclude that the Regulation is invalid and that different disclosures or procedures were mandated by the Truth in Lending Act itself. At present, the civil liability provisions of section 130 [15 U.S.C. § 1640] do not necessarily preclude a finding of liability where the creditor has followed regulatory requirements which subsequently are held invalid. In order to avoid this inequity, a "good faith reliance" provision is suggested for inclusion in the Act.

Board of Governors of the Federal Reserve System, Annual Report to Congress on Truth in Lending for the Year 1972, 14–15 (1973). Thus, it appears that the reference in subsection (f) to "any rule, regulation, or interpretation thereof by the Board" means those requirements of Truth in Lending that have become part of Regulation Z, 12 C.F.R. § 226. But see *Scott v. Liberty Finance Co.*, supra, 380 F.Supp. at 480. Grants does not claim that any "rule, regulation, or interpretation" of the Board as so defined, upon which Grants has relied, has been held invalid. Therefore, its "defense" based upon purported reliance on staff letters and pamphlets is legally insufficient under the new subsection (f). We hold that Grants did not comply with

18. Senate Committee on Banking, Housing and Urban Affairs, Truth in Lending Act Amendments [S. 2101], S.Rep.No.93–278, 93d Cong., 1st Sess. 13. Section 206 of S. 2101 became § 406 of Pub.L.No.93–495. Similar provisions appeared as § 211 of S. 1630 and § 206 of S.

914, which were the subject of hearings where similar issues were raised. See Hearings on S. 1630 and S. 914 Before the Subcomm. on Consumer Credit of the Senate Comm. on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. 418.

the requirements of law in failing to use the term "unpaid balance."

## B. "Finance Charge" Disclosure

■ The district court also found that the net finance charge in the add-on contract for the coupon plan [19] was not clearly, conspicuously and meaningfully disclosed within the requirements of Conn.Reg. §§ 36–395–5(a), 36–395–7(c)(8)(A), cf. 12 C.F.R. §§ 226.6(a), 226.-8(c)(8)(i). This finding was in accord with *Welmaker*, supra, 365 F.Supp. at 535, where the same arrangement was found confusing. Grants argues that this is not so, and in any event that the issue was not a proper subject for summary judgment. In *Welmaker*, the finding of confusion was made after a trial.

We do not agree that an evidentiary hearing was necessary. The district court had before it the forms in question, as we do, and there was nothing to have a hearing about. Why the arrangement is confusing is apparent from an examination of the form in appendix B. To the right of item 7, "Amount financed," is a large space where the dollar figure to be financed is placed. This figure equals the balance still due, less the unearned finance charge,[20] from the original contract, plus new insurance charges, if any, plus the new amount borrowed. Below item 7 is item 8, which contains two parts: "(a) Finance charge" and "(b) Less rebate $_____ equals." 8(a) is the actual finance charge on the total in space 7. 8(b) is the unearned finance charge from the earlier contract which the present add-on loan contract extends. Thus, directly below the dollar figure of the total amount financed,

space 7, appears a figure in space 8 which is less than the true finance charge. An example from plaintiffs' brief illustrates the point well. Plaintiff Robertson's contract, a portion of which is attached as appendix C, discloses an amount financed of $796.41 (item 7) and a finance charge of $177.56 (item 8(a)) "less rebate $77.21 equals $100.35." Instead of disclosing the finance charge of $177.56 prominently underneath the "Amount financed" of $796.41, and in the column where all the other numerical disclosures are made, Grants discloses the finance charge off to the left of that column, in a smaller space. In the space where the format of the contract leads one to expect disclosure of the finance charge, Grants instead discloses the unlabeled "net finance charge" of $100.35. Thus, the natural result of Grants' arrangement of the disclosed figures is to view the $100.35 "net finance charge" as the genuine finance charge since it is disclosed far more prominently than the actual finance charge of $177.56. This makes the finance charge appear to be less than it actually is and is certainly misleading.[21] We agree with the district court that Grants' disclosure in this respect is not clear, conspicuous and meaningful.

## C. Disclosure of Non-Rebated Insurance Premiums

■ Grants argues that a question of fact exists as to the adequacy of disclosure of its non-rebated insurance premiums in the coupon add-on contracts.[22] The problem arises when a contract on which insurance has been purchased by the debtor is extended by an "add-on" of a new amount. When this occurs, the

---

**19.** Any add-on, which is merely an increase in the debt and a corresponding extension of payments, is "considered a new transaction subject to the disclosure requirements" of the regulations. Conn.Regs. § 36–395–7(j), cf. 12 C.F.R. § 226.8(j).

**20.** The unearned finance charge is that portion of the finance charge from the original contract which is not collected by Grants due to the early repayment of the original loan through the refinancing and extension of the

original debt. It is essentially the interest and other charges saved by a debtor when a loan is repaid prior to the scheduled maturity date.

**21.** Compare the forms in appendices A and B in this respect and notice how much less misleading form A is.

**22.** Any "add-on" would be a new contract calling for full disclosure. See note 19 supra.

unearned finance charge on the old amount is rebated but the unearned insurance charges are not. The insurance carrier's contract with Grants seems to indicate that the insurance terminates upon the refinancing evidenced by the add-on contract, but Grants and the carrier both have submitted affidavits stating that the insurance on the previous balance continues in force for the new term of repayment. The court below recognized the possible difference of interpretation but held it did not matter. We agree.[23] If the insurance is terminated when the add-on contract is entered into, Connecticut law mandates that a refund be paid or credited. C.G.S.A. § 38–253.[24] Since this is concededly not done and the non-refunded amount is not disclosed, Grants would be in violation of Conn.Regs. § 36–395–7(c)(8)(A), cf. 12 C.F.R. § 226.8(c)(8)(i), for failure to disclose a charge imposed "as an incident to or as a condition of the extension of credit." Conn.Regs. § 36–395–3(a), cf. 12 C.F.R. § 226.4(a). If, on the other hand, as Grants contends, it automatically extends the period of the old insurance on the original amount for the term of the new loan, this insurance purchase would be "required by the creditor" under Conn.Regs. § 36–393–3(a)(5), cf. 12 C.F.R. § 226.4(a)(5)(i). Even if it is a "free-ride" for the period the contract is extended, as defendant asserts,[25] the debtor is at least paying for the balance of the initial term of insurance with an unearned but non-rebated premium. This is not voluntarily done by the debtor and so must be disclosed. Conn.Regs. § 36–395–7(c)(8)(A), cf. 12 C.F.R. § 226.-8(c)(8)(i). See *Welmaker*, supra, 365 F.Supp. at 537–39. Thus, whichever set of facts is correct, Grants has not made the required disclosure.[26]

### D. Itemization of Finance Charge

The district court also found that Grants violated Conn.Regs. § 36–395–7(c)(8)(A), cf. 12 C.F.R. § 226.8(c)(8)(i), by not itemizing the component parts of the finance charge. Conn.Regs. § 36–395–3(a), cf. 12 C.F.R. § 226.4(a), defines "finance charge" to include all charges imposed as a condition of the extension of credit. In part II–C above we determined that, one way or the other, Grants did not disclose a charge related to unrebated insurance premiums in add-on contracts. Thus it is obvious that in failing to reveal this charge in such contracts Grants did not indicate all the elements of the finance charge. Indeed, in its brief Grants tacitly concedes this position by arguing only that if insurance premiums are not a part of the finance charge, that charge need not be further described.

The district court, however, went further and held that if Grants was correct in its assertion that the finance charge was comprised of but one element, a "time-price differential," that element should be spelled out. Grants argues that for a single element finance charge it does not have to identify the component part further. For support it cites a letter from a Board staff attorney written approximately one year after this litigation was instituted, and a Federal Reserve Board Public Information Letter, No. 444, which states that the public should be able to rely upon staff letters even though not approved by the full Board. Even if we disagree with the interpretation expressed in the staff letter, Grants argues that the "good faith" defense discussed earlier should apply here. For the reasons we have discussed above, this defense is not available to a

---

**23.** Since we find a violation under either set of facts, there is no need to hold an evidentiary hearing as Grants urges.

**24.** If plaintiffs had paid up their original accounts at the time they added on to the accounts, the parties have stipulated that the unearned insurance premiums over $1.00 would have been refunded.

**25.** Defendant's first reply brief, at 15–16.

**26.** In *Welmaker*, where Grants was successful in its assertion of the "unintentional violation" defense against other violations, that defense was not allowed regarding the failure to disclose unrebated insurance premiums. *Welmaker*, supra, 365 F.Supp. at 544–45.

defendant who has relied on staff letters rather than a "rule, regulation, or interpretation thereof by the Board" and so is not available here. As to the weight to be given to the letter itself, plaintiffs call to our attention the short shrift a similar staff letter received in *Ratner*, supra, 329 F.Supp. at 278–79.

While we do not have to reach the issue whether a single element finance charge has to be itemized in the case of the add-on contracts, plaintiff Joyce Chapman apparently signed a new account contract in which the insurance purchase was optional within the meaning of Conn.Regs. §§ 36–395–3(a)(5) and (6), cf. 12 C.F.R. § 226.4(a)(5) and (6), and therefore was not part of the finance charge. Thus in her case the finance charge was truly comprised of a single element. But, the question arises, what was that single element? The term "finance charge" is used to cover a multitude of elements: under Conn. Regs. § 36–395–3(a), cf. 12 C.F.R. § 226.-4(a), it can include interest or time-price differentials; service or transaction charges; loan fees, finders fees or points; credit report charges; and insurance charges. There is no way a consumer can tell if the finance charge includes any or all of these elements unless it is spelled out in the contract, and in a way that does not cause confusion. Thus, defendant violated the Truth-in-Lending law by failing to identify the single element finance charge as only a time-price differential.[27] See *Johnson v. Associates Finance, Inc.*, supra, 369 F.Supp. at 1122; *Meyers v. Clearview*

*Dodge Sales, Inc.*, 384 F.Supp. 722, 726 (E.D.La.1974).

E. Description of Claimed Security Interest

The district court found that Grants had violated Conn.Regs. § 36–395–7(b)(5), cf. 12 C.F.R. § 226.8(b)(5), by not identifying sufficiently the items upon which a security interest was claimed. The Grants contract in question states:

(C) that the seller shall retain title to and a purchase money security interest in such merchandise until all amounts due hereunder shall have been paid, and the right to possession in case of default . . . .

Grants claims that no security interest is retained in the coupon plan accounts and the only reason a security is even mentioned is because the same contract is used for "big-ticket" items where an interest is retained.[28] Grants claims that the existence of any retained security interest is an undetermined question of fact so that summary judgment should not have been granted. It is Grants' position that if no security interest is retained, no disclosure is necessary. See *Scott v. Liberty Finance Co.*, supra, 380 F.Supp. at 479. Whether Grants actually retains a security interest is irrelevant. On its face, the contract provides for a security interest and for Grants to reveal later that there is none is hardly the type of disclosure Congress thought would "permit consumers to compare the cost of credit among different creditors and to shop effectively for the best credit buy." S.Rep.No.392, supra, at 1.[29]

27. In a letter dated June 2, 1975, Grants calls to our attention a recent case from the District of Connecticut, *Adams v. New Haven U. I. Federal Credit Union* (Civ.No.15,632, March 14, 1975). *Adams* indicates that for a single item finance charge no further itemization is necessary. Plaintiffs strongly object to the late submission of the letter and point out that the decision in *Adams* was qualified in that the single item finance charge was sufficiently described as interest on the face of the loan form. Here, the finance charge is not described anywhere in further detail. Thus, the *Adams* authority is not applicable.

28. It is interesting to note that in a Tax Court case, *W. T. Grant Co. v. Commissioner,* 58 T.C. 290, 293 (1972), rev'd on other grounds, 483 F.2d 1115 (2d Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1938, 40 L.Ed.2d 288 (1974), it was found that in New York, California, Delaware and Oregon, where state law does not permit title retention in coupon merchandise, Grants in prior years omitted the security interest provisions from its coupon contract.

29. Describing a security interest when there is none may also violate Conn.Regs. § 36–395–5(b), cf. 12 C.F.R. § 226.6(c), because it would constitute additional but misleading information. See *Kenney v. Landis Financial Group, Inc.*, 349 F.Supp. 939, 950–51 (N.D.Iowa 1972).

## III. Connecticut Usury Claims

By two statutes, C.G.S.A. §§ 37–4 [30] and 36–243,[31] it is usurious to loan money at a rate of over 12 per cent per annum in Connecticut. The court below held

> that the coupon plan is indeed usurious, the contract transaction a mere form for what is in substance a loan of the equivalent of money for an excessive return, . . . The customer purchases no goods by contract; he receives scrip to be used like cash to buy merchandise, and for that immediate credit agrees to pay back over an extended time period the principal amount represented by the face value of the coupons, together with a steep surcharge for the delay permitted in satisfying the account debt.

Grants argues that its coupon plan is not usurious and, in any event, cannot be so determined on a motion for summary judgment.

The elements of usury have been described as:

> (1) agreement to lend money or its equivalent or to forbear to require repayment for a period of time; (2) the borrower's obligation to repay absolutely and not contingently; (3) the exaction of a greater compensation for making the loan or agreeing to forbear than is allowed by the applicable State Constitution or usury statute and (4) an intention to violate the usury statute.

Hershman, Usury and the Tight Mortgage Market, 22 Bus.Law. 333, 336 (1967). These elements have been cited as representing Connecticut law in Kafes, Usury and its Progeny: A Survey of Rate Regulation in Connecticut, 43 Conn.Bar.J. 220, 232 (1969). We are hard pressed to discover what facts in addition to those already stipulated need to be developed.[32] Items (2), (3), and (4) cannot be seriously disputed here. The borrower is required to repay the loan, and Grants has charged over 19 per cent interest on the contracts of the three named plaintiffs.[33] The requisite intent to violate the statute is similarly present. All that is necessary is that the defendant intend to charge more than the legal limit—here 12 per cent—and that cannot be challenged here. See *Community Credit Union v. Connors,* 105 A.2d 772, 775 (Conn.Sup.Ct.1954); *Manchester Realty Co. v. Kanehl,* 36 A.2d 114, 116–17 (Conn.Sup.Ct.1944). Grants argues that intent presents a classic question of fact. See *Community Credit Union v. Connors,* supra. This is normally true but in this case, where there is no dispute as to the

---

**30.** C.G.S.A. §§ 37–4 provides:

No person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 21–44, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefore interest at a rate greater than twelve per cent per annum.

**31.** C.G.S.A. § 36–243 provides:

No person, partnership, association or corporation, except as authorized by the provisions of this chapter, shall, directly or indirectly, charge, contract for or receive any interest, charge or consideration greater than twelve per cent per annum upon the loan, use or forbearance of money or credit of the amount or value of one thousand eight hundred dollars or less. The provisions of this section shall apply to any person who, as security for any such loan, use or forbearance of money or credit, makes a pretended purchase of property from any person and permits the owner or pledgor to retain the possession thereof, or who, by any device or pretense of charging for his services or otherwise, seeks to obtain a greater compensation than twelve per cent per annum. No loan for which a greater rate of interest or charge than is allowed by the provisions of this chapter has been contracted for or received, wherever made, shall be enforced in this state, and any person in anywise participating therein in this state shall be subject to the provisions of this chapter.

**32.** The parties entered into extensive stipulations of fact and law covering the operation of Grants' coupon credit plan.

**33.** Mildred Ives—19.88%, Moira Robertson—19.90%, and Joyce Chapman—19.90%. These amounts are not alleged to be atypical.

intended interest rate, there is nothing for the trier of fact to decide. See *Manchester Realty Co. v. Kanehl,* supra.

■ The only substantial issue is whether the coupons are money or its equivalent within the contemplation of C.G.S.A. §§ 37–4, 36–243. Grants points out that coupons can only be used at its own stores and will be replaced if lost or stolen. On the other hand, Grants itself advertises: "Use them like cash in any department of the W. T. Grant Company or member stores." [34] In addition, for coupon contracts entered into after January 1, 1971, once a single coupon is "spent" the total coupon amount becomes due for scheduled repayment.[35] If the coupons were treated as credit for merchandise purchases, instead of as money, the repayment obligation would accrue in stages as the goods were purchased rather than all at once.

In other states, similar Grants' coupons have been declared to be money in the usury context. See *Rathbun v. W. T. Grant Co.,* 219 N.W.2d 641, 649 (Minn. Sup.Ct.1974); *W. T. Grant Co. v. Walsh,* 241 A.2d 46, 48 (N.J.Dist.Ct.1968). See also *State v. W. T. Grant Co.,* CCH Consumer Credit Guide ¶¶ 99,135, 99,146 (Wisc.Cir.Ct.1972) (1969–1973 Transfer Binder). Grants argues that the statutes in the first two cases, Minn.Stat. § 334.-01 and N.J.Stat. § 31:1–1, are not limited solely to "money" as are C.G.S.A. §§ 37–4, 36–243. Thus, those decisions are not apposite in determining whether Grants' coupons are money or its equivalent for the "narrower" Connecticut statutes. We agree that the Minnesota and New Jersey statutes are broader than the Connecticut statutes. Nonetheless, in both *Rathbun* and *Walsh* the coupons

were found to be the equivalent of money, not the equivalent of something else also covered by the statutes. And there is no reason why in this context the Connecticut statute should be limited in a way the New Jersey or Minnesota statutes are not. The Connecticut Supreme Court of Errors has stated in reference to the state's usury laws "it would be difficult to conceive of a more inclusive statute." *Contino v. Turello,* 101 Conn. 555, 126 A. 725, 727 (1924). Connecticut's usury statutes were enacted for the benefit of those debtor groups needing special protection. *In re Feldman,* 259 F.Supp. 218, 221 (D.Conn.1966); *State v. Griffith,* 83 Conn. 1, 74 A. 1068, 1069, aff'd, 218 U.S. 563, 31 S.Ct. 132, 54 L.Ed. 1151 (1910). It is thus in keeping with the intent of the Connecticut drafters to construe the statute to protect those low-income people most likely to become enmeshed in Grants' coupon credit plan.

Grants also claims C.G.S.A. § 36–243 only applies to organizations in the business of making small (under $1,800) loans. According to Grants, "the record is absolutely barren of any facts to support a conclusion that defendant did 'engage in the business of making loans of money or credit.'"[36] The argument disappears once it is determined that the coupons are money or its equivalent, since, according to the stipulated facts, Grants made such loans in the ordinary course of its business.[37]

Grants also parades some "horribles" before us: If we hold the coupon credit plan usurious, then all the Grants "big ticket" credit transactions, which use the same blank forms, and the retail installment sales of most automobiles, which use similar forms, would be invalid as well. This is nonsense. A refrigerator

---

**34.** There were 25 "member stores" in Connecticut during the 1965–1972 period.

**35.** For coupon contracts entered into prior to that date the repayment obligation accrues immediately. This is even more clearly like the loan of money. In addition, once the first coupon is spent Grants charges for the entire balance even if the remaining coupons are never

used. This, too, is more like a loan than an advance of credit.

**36.** Brief of Defendant-Appellant, at 46.

**37.** According to the stipulation, there were 27,-000 coupon plan contracts outstanding in Connecticut in May 1973.

or an automobile is not "the equivalent of money," as the district court found the coupons were.

## IV. Class and Injunctive Relief

Grants' final challenges relate to the issuance of an injunction and the propriety of class action status as to that injunction. The district court ordered:

That the defendant be and is hereby permanently enjoined from collecting any further payments under outstanding coupon contracts made in Connecticut, and from entering hereafter into any coupon contracts in Connecticut on which the annual percentage rate exceeds twelve per cent.

Grants argues that plaintiffs have not shown the irreparable damage and lack of an adequate remedy at law necessary to justify injunctive relief. It points to C.G.S.A. §§ 37–8, 36–243 as providing a legal defense in any action to recover on a loan on which greater than 12 per cent interest has been charged.

■■■■ Rather than merely examining the technicalities of issuing an injunction, as Grants urges, we will look at the realities of the Connecticut situation. Equity decrees are to be applied flexibly to fit the needs of each situation. *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Here we have a major retailer, a substantial portion of whose sales in fiscal 1971 were made under the coupon purchase plan, using a program which we have determined to be illegal in Connecticut. It is hard to believe that most purchasers of Grants' coupon books will avail themselves of the remedies under Connecticut law,[38] or even know of them or of this suit. A somewhat similar situation was presented in *State v. J. C. Penney Co.,* 179 N.W.2d 641, 655–57 (Wis.Sup.Ct.1970). Defendant's credit plan had been determined to violate Wisconsin's usury law but the trial court refused to enjoin its operation. It apparently felt that the usury defense was a personal one. Id. at

655–56. The state supreme court ordered an injunction anyway, noting:

We take judicial notice of the widespread use of the revolving charge account and of the large number of Wisconsin citizens affected by these practices. We have no hesitancy in endorsing an injunction against the usurious practices which clearly constitute a public nuisance here and should be discontinued.

Id. at 657. We agree with this reasoning and believe the district court's injunction was properly entered.[39]

■■■■ Grants' second objection to the injunction lies in its application to the class of coupon plan contract holders. While admitting that notice is not required in a Fed.R.Civ.P. 23(b)(2) "injunctive relief" class action, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 n. 14, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Lynch v. Household Finance Corp.,* 360 F.Supp. 720, 722 n. 3 (D.Conn.1973) (three-judge court), Grants claims that the relief here was not truly "injunctive." Instead, it argues that ordering a defendant not to collect money from the class members is the same as ordering a defendant to pay damages. Thus, notice should be required here.

We do not agree. The district court was quite careful in fashioning its class remedy. For example, plaintiffs had asked for an injunction ordering Grants to return money allegedly collected unlawfully. This was refused on the grounds that such an award would in actuality be class-wide damages and thus unavailable without proper notice. The district court was correct in enjoining defendant's unlawful practices. Were we to accept Grants' argument that notice was required before an injunction could issue here, we would be allowing Grants to continue reaping the benefit of its illegal acts. By enjoining it from collecting on its usurious contracts, we are merely requiring it to stop violating

---

**38.** Connecticut law provides that no action shall be brought to recover either principal or interest on a loan found usurious. C.G.S.A. §§ 37–8, 36–243.

**39.** Grants' coupon plan was recently enjoined as usurious in Wisconsin as well. *State v. W. T. Grant Co.,* supra.

the law.  This is a far cry from an    Judgment affirmed.
award of class-wide damages.[40]

## APPENDIX A

Disclosure portion of W.T. Grant's financing contract
for new customer accounts

| QUANTITY | DESCRIPTION OF GOODS OR SERVICES | PRICE | SERIAL NO. |
|---|---|---|---|
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 1. Cash price of goods | | 7. Amount financed (the sum of lines 5, 6(a) and (b) | |
| 2. Cash down payment | | 8. FINANCE CHARGE | |
| 3. Unpaid balance of cash price (1 minus 2) | | 9. Deferred payment price (the sum of lines 1, 4, 6(a), (b) and 8) | |
| 4. Property insurance (if selected, based on 1) | | 10. Total of payments (7 plus 8) (Time balance) | |
| 5. Total of 3 plus 4 | | The Buyer agrees to pay to the Seller the "Total of Payments" shown above (10) in_____equal monthly instalments of $_____ and one final instalment of _____starting on_____and all subsequent instalments on the same day of each consecutive month until paid in full. When a coupon book is purchased the payment obligation will be the same as set forth above except that the first payment date shall be 30 days from the date the coupons are first exchanged for specific merchandise. |
| 6. Other insurance charges: (a) Credit life (if selected) | | | |
| (b) Accident & sickness (if selected) | | | |

## APPENDIX B

Disclosure portion of W.T. Grant's financing contract
for "add-on" accounts

| QUANTITY | DESCRIPTION OF GOODS OR SERVICES | PRICE | SERIAL NO. |
|---|---|---|---|
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| A. Prior balance due before rebate of FINANCE CHARGE | | 7. Amount financed (the sum of lines B, 5, 6(a) and 6(b) | |
| B. Prior balance due after rebate of FINANCE CHARGE | | 8. (a) Finance charge $_____, (b) Less rebate $_____ equals | |
| 1. Cash price (new sales) | | 9. Deferred payment price (the sum of lines B, 1, 4, 6(a), 6(b) and 8(a) | |
| 2. Cash down payment | | 10. Net add-on (the sum of lines 5, 6(a), 6(b) and 8 | |
| 3. Unpaid balance of cash price (1 minus 2) | | 11. Total payments (the sum of lines 7 and 8(a)) | |
| 4. Property insurance (if selected, based on 1) | | The Buyer agrees to pay to the Seller the "Total of Payments" shown above (11) in_____equal installments of $_____and one final installment of $_____starting on_____ and all subsequent installments on the same day of each consecutive month until paid in full. |
| 5. Total of 3 plus 4 | | |
| 6. Other insurance charge: (a) Credit life insurance (if selected) | | |
| (b) Accident and sickness insurance (if selected) | | |

See Appendix C on next page

**40.** While at first reading it may seem harsh to enjoin Grants from collecting on coupons already used, the practical effect of the decision will be limited.  According to Grants, 90% of all coupons are exchanged for merchandise within 60 days of issuance of the coupon books, and 99.5% are either exchanged or returned within one year.  Grants also states that it voluntarily suspended sales of coupon books in Connecticut on January 1, 1973. Since the injunction in this action was not entered until April 25, 1974, almost 15 months later, Grants' losses due to its inability to collect on outstanding contracts should be limited.

## APPENDIX C

Disclosure portion of plaintiff Robertson's
"add-on" account

| QUANTITY | DESCRIPTION OF GOODS OR SERVICES | PRICE | SERIAL NO. |
|---|---|---|---|
| 1 | Coupon Book | 2 00 | A 713900 |
| 1 | Coupon Book | 50 | B 809963 |
| 1 | Coupon Book | 25 | N 670538 |
| 1 | Coupon Book | 20 | C 701963 |

| | | | | |
|---|---|---|---|---|
| A. Prior balance due before rebate of FINANCE CHARGE | 553.44 | 7. Amount financed (the sum of lines 8, 5, 6(a) and 6(b) | | 796.41 |
| B. Prior balance due after rebate of FINANCE CHARGE | 476.23 | 8. (a) Finance charge $177.56, (b) Less rebate $ 77.21 equals | | 100.35 |
| 1. Cash price (new sales) | 295 - | 9. Deferred payment price (the sum of lines 8, 1, 4, 6(a), 6(b) and 8(a) | | 973.97 |
| 2. Cash down payment | - | 10. Net add on (the sum of lines 5, 6(a), 6(b) and 8 | | 420.53 |
| 3. Unpaid balance of cash price (1 minus 2) | 295 - | 11. Total payments (the sum of lines 7 and 8 (a)) | | 973.97 |
| 4. Property insurance (if selected, based on 1) | 9.41 | The Buyer agrees to pay to the Seller the "Total of Payments" shown above (11) in 24 equal installments of $ 40 · and one final installment of $ 13.97 starting on 12·26· 71 and all subsequent installments on the same day of each consecutive month until paid in full. | | |
| 5. Total of 3 plus 4 | 304.41 | | | |
| 6. Other insurance charge: (a) Credit life insurance (if selected) | 3.89 | | | |
| (b) Accident and sickness insurance (if selected) | 11.88 | | | |