Chuck ST. GERMAIN, Plaintiff,

v.

BANK OF HAWAII, Defendant.

Civ. No. 75–0143.

United States District Court,
D. Hawaii.

April 12, 1976.

John H. Paer, Legal Aid Society of Hawaii, Honolulu, Hawaii, for plaintiff.

George L. Dyer, Jr., David J. Reber, Goodsill Anderson & Quinn, Honolulu, Hawaii, for defendant.

## DECISION

PENCE, District Judge.

Plaintiff seeks to recover statutory damages and costs of litigation, including reasonable attorney's fees, alleging violations of the Truth-in-Lending provision of the Federal Consumer Credit Protection Act (Act), 15 U.S.C.A. §§ 1601–1641, and Federal Reserve Regulation Z (Regulation Z), 12 C.F.R. 226, arising from the assignment of a retail installment contract to defendant Bank of Hawaii (Bank) pursuant to the purchase of an automobile by plaintiff. Jurisdiction is conferred on this court by 15 U.S.C.A. § 1640(e). On the uncontroverted facts set forth below, plaintiff has moved for summary judgment, defendant has cross-moved for summary judgment, and upon oral argument and submission of closing briefs by both parties, the following issues raised at various stages of these proceedings require resolution:

(1) Was Bank liable under the Act for the automobile dealer's omission of the annual percentage rate from plaintiff's copy of the retail installment contract?

(2) Was the security interest retained by Bank as a result of the assignment of the retail installment contract adequately described or identified and disclosed in accordance with the Act?

(3) Were the finance charge and annual percentage rate disclosed more conspicuously than other disclosure entries in accordance with the Act?

(4) Was defendant's reservation of the right to accelerate full payment of the obligation upon default by the plaintiff a required disclosure, and, if so, was this provision adequately disclosed in conformance with the disclosure requirements of the Act?

(5) Was defendant's disclosure of the finance charge without further description or itemization a violation of the disclosure requirements of the Act?

(6) Was defendant's inclusion of a title transfer fee and certificate of ownership and certificate of registration replacement fee in the total cash price a violation of the Act in that such fees should have either been disclosed as "other fees" or itemized as part of the finance charge?

(7) Was the absence of an "unpaid balance" itemized entry in the disclosure entries on the face of the retail installment contract a violation of the disclosure provisions of the Act?

## FACTS

On November 23, 1974, plaintiff Chuck St. Germain executed a retail installment contract (contract) with Windward Volkswagen, Inc., for purchase of a 1970 Volkswagen. Plaintiff's copy of the contract labeled "Buyer's Copy" had no entry under item 9 of the Statement of Charges, opposite the entry "Annual Percentage Rate ___%." On the "Original-Bank's Copy" of the contract this blank was filled in with the handwritten figures "18.15", and was received by defendant Bank in that form.

On the face of the contract, paragraph 5, headed "Security Interest", states that defendant Bank retains title to the property, previously described at the head of the contract and thereafter described as "property", and has a security interest therein until payment in full of the contract obligation. The description of the car includes year, make, model, body type, serial number, and license number.

Item 9 of the Statement of Charges of the contract is titled "Finance Charge at Annual Percentage Rate" with all words except "at" in bolder relief and larger print than appears in the other items of the Statement of Charges.

In paragraph 10 on the reverse of the contract, a bold-type heading "Seller's Rights and Remedies" appears. The paragraph states that upon default by the buyer or the occurrence of other events leading seller to believe that payment or performance is impaired, at seller's option the full amount due will be immediately due and payable. The paragraph further enumerates seller's rights upon default as those accruing under the provisions of Chapter 476, H.R.S., the retail installment sales act of Hawaii. Reference is also made to remedies under the Uniform Commercial Code to the extent that there is no conflict with Chapter 476.

The "TOTAL CASH PRICE", item 1 of the Statement of Charges in the contract, includes a one dollar motor vehicle transfer fee imposed on the transferee by H.R.S. §§ 286–51 and 286–52. Two additional one dollar fees were charged plaintiff by the dealer for replacement of previously lost or defaced motor vehicle legal ownership and registration certificates, respectively, such charges being provided for in H.R.S. § 286–55. This court takes judicial notice of the fact that the motor vehicle transfer fee, *supra,* includes the issuance of a new certificate of ownership and certificate of registration to the transferee complying with the statute.

The two one dollar fees, *supra,* were charged by the dealer in this transaction to obtain the certificates of ownership and registration which would subsequently be required to effect transfer of title under §§ 286–51 and 286–52.

The finance charge under item 9 of the Statement of Charges in the contract has a single entry of $313.40.

Items 4 through 8 of the Statement of Charges in the contract appear as follows:

| | | |
|---|---|---|
| 4. | TOTAL DOWN PAYMENT | $ 250.00 |
| 5. | UNPAID BALANCE OF CASH PRICE | $1567.00 |
| 6. | INSURANCE-Total from Insurance Statement | $ 0 |
| 7. | TITLE TRANSFER AND/OR RECORDING FEES | $ Included |
| 8. | AMOUNT FINANCED (Total items 5 through 7) | $1567.00 |

Below a heading "ASSIGNMENT AND GUARANTY OF CONTRACT" on the reverse of the "Original-Bank's Copy" of the contract is the date November 23, 1974, and signature of an agent of Windward Volkswagen, Inc., assigning the contract to defendant Bank. The signature of Chuck St. Germain appears on the face of the contract below all entries described above as being on the face of the contract.

Plaintiff commenced this action on May 15, 1975.

## PRELIMINARY DISCUSSION

In view of the strict civil liability imposed on creditors by the Act, it is appropriate to delineate here the sources of law and interpretation available to creditor in his determination of what he is required to disclose under the Act. These sources include the Act itself, Regulation Z promulgated by the Federal Reserve Board, formal interpretations appended to Regulation Z and number-coded to the appropriate section of the Regulation, 12 C.F.R. 226.201–226.1002, FRB and Federal Trade Commission staff opinion letters, and the case decisions of the district and circuit courts. Because of this awesome, confusing and sometimes conflicting mass of "authority", this court has attempted to set forth hereinafter in almost hyper-detail an analysis of the "sources of law and interpretation", in hope that the creditor may find some relief therein.

### Regulation Z

The validity of Regulation Z as a proper exercise of the Federal Reserve Board's statutory authority was upheld in *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318, 329 (1973):

Where the empowering provision of a statute states simply that the agency may "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."

Consistent with this holding, after finding that 15 U.S.C.A. § 1604 of the Act constituted a broad grant of rulemaking authority as to defining classifications of transactions necessary to carry out the objectives of the Act, the Court accepted the remedial measure chosen by the Board in Regulation Z:

We have consistently held that where reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority. 411 U.S. at 371–72, 93 S.Ct. at 1662, 36 L.Ed.2d at 331.

### Weight of Agency Interpretation of Regulations

The weight to be given agency interpretation of its administrative regulations is set forth in *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945):

Since this involves an *interpretation of an administrative regulation* a court must necessarily look to the administrative construction of the regulation if the meaning of the words is in doubt. . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. The legality of the result reached by this process, of course, is quite a different matter. (Emphasis added.)

That greater weight should be given to an agency's interpretation of its administrative *regulations* than to an agency's interpretation of a *statute* is reflected in *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964). *Udall* was more concerned with the problem of administrative agency interpretation of a *statute* than agency interpre-

tation of administrative regulations promulgated pursuant to an enabling statute. However, *Udall* established its own spectrum of deferential weight. After acknowledging that *great* deference should be shown the interpretation given the statute by the officers or agency charged with its administration, the Court went on to say:

> When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order. 380 U.S. at 16, 85 S.Ct. at 801, 13 L.Ed.2d at 625.[1]

*Good Faith Compliance and Staff Opinion Letters*

The recent enactment of subsection (f) to 15 U.S.C.A. § 1640 [2] provides a "good faith compliance" defense, in the event of the amendment, rescission, or judicial or other authority invalidation of a rule, regulation, or interpretation of the Federal Reserve Board, prospectively from the act of attempted compliance. When the defendant in *Ives v. W. T. Grant Co.,* 522 F.2d 749, CCH Consumer Credit Guide ¶ 98,561 (2d Cir. 1975), sought to include in "rule, regulation, or interpretation" Board staff letters or pamphlets, the court relied upon the following drafting committee report as repudiating that inclusion:

> The Truth in Lending Act is highly technical and the Committee does not believe a creditor should be forced to choose between the Board's construction of the Act and the creditor's own assessment of how a court may interpret the Act. Accordingly, the Committee recommends an amendment to Truth in Lending requested by the Board which would relieve a

creditor of any civil liability under Truth in Lending for any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board. In order to confer immunity from civil liability, the rule, regulation, or interpretation thereof must be approved by the Board itself and not merely by the staff of the Board.[3]

The court in *Ives* went on to find defendant's reliance on staff letters and pamphlets legally insufficient under the new subsection (f) because defendant could not show reliance on any "rule, regulation, or interpretation" of the Board which had subsequently been held invalid.

This court cannot agree wholly with that conclusion, for it elevates form over substance, the substance being that the staff opinion letters are clearly the only manageable vehicle by which the Board may respond to the mass of inquiries from creditors or prospective creditors regarding compliance with the Act's rules, regulations, and interpretations. The continued issuance of these letters even after the enactment of subsection (f) would seem to indicate that the Board still considers them to be a viable and *Board-approved* vehicle for interpretation of Regulation Z.[4] The publishing of these letters, with tacit Board approval, in such services as CCH Consumer Credit Guide provides them national distribution and the alert researcher would certainly maintain vigilance on their publication therein. The Board's approval of staff opinion letters was manifested in its annual report to Congress for the year 1974 in which the Board noted that *Bone* and *Philbeck (supra,* note 1) had "upheld the validi-

---

1. The Ninth Circuit in *Bone v. Hibernia Bank,* 493 F.2d 135 (1974) and *Taylor v. R. H. Macy & Co.,* 9 Cir., 481 F.2d 178 (1973), as well as the Fifth Circuit in *Philbeck v. Timmers Chevrolet, Inc.,* 499 F.2d 971 (1974) reached the same result as set out by *Bowles.* Unfortunately they overlooked the *Bowles-Udall* distinctions, and their conclusions therefore incorrectly relied on a broadened base of cases that are distinguishable in fact and law or were simply misquoted. They thus inferentially diluted the verity of their own decisions.

2. Pub.L. No. 93–495, § 406, 1 U.S.Code Cong. & Ad.News, 93d Cong., 2d Sess. 1974 at p. 1745.

3. Senate Committee on Banking, Housing, & Urban Affairs, Truth in Lending Act Amendments [S. 2101, S.Rep. No. 93–278, 93d Cong., 1st Sess. 13.

4. Staff Opinion Letters numbered 841–961 were published between October 30, 1974—November 28, 1975. See FRB Number Table, 4 CCH Consumer Credit Guide at 65,951–52.

ty of the Board's regulations or informal staff opinion letters." [5]

In this context, *Ives* would only carry authoritative weight on the issue of reliance under the circumstance that a staff opinion letter had subsequently been found invalid, with a consequent question of whether a defendant would have a good faith reliance defense thereon. Certainly *Ives* would have no bearing on the great deference to be accorded agency interpretation of an administrative regulation so long as the interpretation met the test of consistent and not clearly erroneous construance or explanation.

Staff opinion letters also carry value as forerunners of anticipated formal Board interpretations when the subject addressed extends beyond the evaluation of a particular disclosure statement which is the subject of inquiry. For example, staff opinion letter No. 682 of April 25, 1973,[6] dealt with the proper form of disclosure of the finance charge when that charge is comprised of add-on interest only. Formal Board interpretation § 226.820 of November 21, 1975,[7] adopted the view of letter 682 and expanded it to provide for the method of disclosure of the finance charge when any type of single charge comprised the finance charge.

■ As above indicated, in dealing with the issues herein, then, this court will confer great deference upon the formal interpretations of the Federal Reserve Board. The Board staff opinion letters which point to a reasonable and not inconsistent interpretation of the regulations and show no inconsistency in the event a number of letters deal with the same subject will also be accorded such deference.

## ISSUE I

## LIABILITY OF A SUBSEQUENT ASSIGNEE

Plaintiff in his motion for summary judgment has expressly withheld his contention that the blank annual percentage rate in the buyer's copy of the retail installment contract can be attributed to defendant in view of defendant's answer to the complaint in which defendant attaches as an exhibit "Original-Bank's Copy" of the contract. Defendant, nevertheless, in his cross-motion for summary judgment revives the issue and moves for summary judgment thereon.

Accepting plaintiff's allegation that the annual percentage rate was in fact not inserted in the blank provided for in *his* copy of the contract, this court nevertheless finds for defendant. Defendant has submitted affidavits from bank employees handling the contract upon receipt from the assignor showing that the blank for the annual percentage rate had been previously filled in with the handwritten figures "18.15" when received by the bank employees.

Two provisions in the Act address themselves specifically to the matter of the liability of a subsequent assignee of the original creditor.

■ 15 U.S.C.A. § 1641 addresses the effect of written acknowledgement of receipt by a person to whom a statement is required to be given by the Act:

> Except as provided in section 1635(c) of this title and except in the case of actions brought under section 1640(d) of this title, in any action or proceeding by or against any subsequent assignee of the original creditor without knowledge to the contrary by the assignee when he acquires the obligation, written acknowledgement of receipt by a person to whom a statement is required to be given pursuant to this subchapter shall be conclusive proof of the delivery thereof and, unless the violation is apparent on the face of the statement, of compliance with this part.

Plaintiff here does not dispute the lack of knowledge of defendant with respect to the

---

**5.** Truth-in-Lending Annual Report to Congress for the Year 1974 by the Board of Governors of the Federal Reserve System, CCH Consumer Credit Guide Issue No. 326, Part II, January 15, 1975 at 8.

**6.** CCH Consumer Credit Guide ¶ 30,972.

**7.** 40 Fed.Reg. 55635 (1975).

absence of the figures on his copy of the contract, and defendant's affidavits disclaim any prior instances of such deletion which may have served to put defendant's employees on constructive notice of such activity by the creditor. Absent showing to the contrary, plaintiff's written acknowledgement is conclusive proof of compliance with the Act as to defendant.

Part A., *General Provisions* of the Act further absolves defendant from liability under a recent amendment which added § 115 to Part A:

> Except as otherwise specifically provided in this title, any civil action for a violation of this title which may be brought against the original creditor in any credit transaction may be maintained against any subsequent assignee of the original creditor where the violation from which the alleged liability arose is apparent on the face of the instrument assigned unless the assignment is involuntary.[8]

Defendant clearly falls within the purview of this provision, is not included in any cited exceptions to either provision, *supra,* and is therefore not liable to the plaintiff. Defendant's motion is GRANTED as to this issue.

### ISSUE II

### ADEQUATE IDENTIFICATION, DESCRIPTION, AND DISCLOSURE OF SECURITY INTEREST

▮ Plaintiff alleges in his amended complaint that defendant failed to adequately describe or identify the type of security interest retained by defendant. Defendant moves for summary judgment in his cross-motion.

15 U.S.C.A. § 1638(a) provides as follows:

(a) In connection with each consumer credit sale not under an open end credit plan, the creditor shall disclose each of the following items which is applicable:

.   .   .

(10) A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates.

With respect to the property in the instant case, Regulation Z does not appreciably elaborate on the provision of the Act:

> (5) A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates
>
> .   .   .   .

12 C.F.R. § 226.8(b)(5).

Placement of this disclosure is governed by 12 C.F.R. § 226.8(a) of Regulation Z:

> (a) .   .   . All of the disclosures shall be made together on either
>
> (1) The note or other instrument evidencing the obligation on the same side of the page and above or adjacent to the place for the customer's signature; or
>
> (2) One side of a separate statement which identifies the transaction.

The facts in the instant case absolve the defendant of any violation under the above provisions. The property is identified in detail as set forth in the statement of facts, *supra.* The provision purporting to create a security interest in the described property is positioned on the same side of the contract and above the customer's signature. The security interest provision is as follows:

> 5. SECURITY INTEREST. To secure the payment and performance of all Buyer's obligations hereunder, Seller has retained title to the Property and has a security interest therein and in all accessories therefor and special or auxiliary equipment used in connection therewith, or in substitution, in whole or in part, for any thereof, and proceeds until all amounts due hereunder are fully paid.

---

8. Pub.L. No. 93–495, § 413(a), 1 U.S.Code Cong. & Ad.News, 93d Cong., 2d Sess. 1974 at p. 1748.

Retention of title until all amounts due under the contract are paid is a clear, unequivocal description of the type of security interest held by the creditor and subsequent assignee in the instant case as a matter of law. Summary judgment is GRANTED defendant as to this issue.

## ISSUE III

### DISCLOSURE OF FINANCE CHARGE AND ANNUAL PERCENTAGE RATE MORE CONSPICUOUSLY THAN OTHER ENTRIES

█ Plaintiff moves for summary judgment alleging inadequate disclosure of the finance charge and annual percentage rate in that these entries were not disclosed more conspicuously than other entries in the Statement of Charges of the contract in violation of the Act.

12 C.F.R. § 226.6(a) provides as follows:

(a) *Disclosures: general rule* . . . . [W]here the terms "finance charge" and "annual percentage rate" are required to be used, they shall be printed more conspicuously than other terminology required by this part and all numerical amounts and percentages shall be stated in figures and shall be printed in not less than the equivalent of 10 point type, .075 inch computer type, or elite size typewritten numerals, or shall be legibly handwritten.

Defendant contends, and rightly so, that simple view of the disclosure statement of the contract shows that in the Statement of Charges of the contract the terms in issue are printed in bolder relief and larger type than the other terminology required to be disclosed. The handwritten amount of the finance charge and annual percentage rate is legible. Plaintiff's motion as to this issue is without merit and is DENIED.

## ISSUE IV

### DISCLOSURE OF ACCELERATION UPON DEFAULT PROVISION

Plaintiff moves for summary judgment on the ground that defendant did not properly disclose a right to accelerate the entire amount due and payable under the provisions of the contract upon default of the debtor. Incorporating plaintiff's claim as set forth in the amended complaint, the violation allegedly derives from that provision of Regulation Z which requires the disclosure of the "amount, or method of computing the amount, of any default payable in the event of late payments." (Plaintiff's quote.)

15 U.S.C.A. § 1638 provides for required disclosures by the creditor in sales not under open end credit plans. The pertinent portion of that section states:

(a) . . . the creditor shall disclose each of the following items which is applicable: . . . (9) The default, delinquency, or similar charges payable in the event of late payments.

Another provision of the Act, 15 U.S.C.A. § 1634, not cited by either plaintiff or defendant, was also the subject of a subsection of Regulation Z. Section 1634 provides:

If information disclosed in accordance with this part is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part.

From the general regulatory power conferred by the Act, and construing the above provisions, the FRB promulgated the following subsections of Regulation Z.

In 12 C.F.R. § 226.8(b), referring to specific disclosures in credit other than open end:

. . . (b) In any transaction subject to this section, the following items, as applicable, shall be disclosed:

. . . (4) The amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments.

. . . (6) A description of any penalty charge that may be imposed by the creditor or his assignee for prepayment of the principal of the obligation (such as a real estate mortgage) with an explana-

tion of the method of computation of such penalty and the conditions under which it may be imposed . . .

(7) Identification of the method of computing any unearned portion of the finance charge in the event of prepayment in full of an obligation which includes precomputed finance charges and a statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate of such unearned finance charge that will be credited to an obligation or refunded to the customer. If the credit contract does not provide for any rebate of unearned finance charges upon prepayment in full, this fact shall be disclosed.

In 12 C.F.R. § 226.6(g), with accompanying explanatory footnote specifying general disclosure requirements:

. . . (g) *Effect of subsequent occurrence.* If information disclosed in accordance with this part is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part.[6]

[6] Such acts, occurrences, or agreements include the *failure of the customer to perform his obligations under the contract* and such actions by the creditor as may be proper to protect his interests in such circumstances. Such failure may result in the liability of the customer to pay delinquency charges, collection costs, or expenses of the creditor for perfection or acquisition of any security interest or amounts advanced by the creditor on behalf of the customer in connection with insurance, repairs to or preservation of collateral. (Emphasis added.)

The Board has elaborated upon and explained §§ 226.8(b)(6) and (7) in interpretation 12 C.F.R. § 226.818 (Refund of unearned finance charge; prepayment penalty). The Board in this interpretation distinguished the transactions to which § 226.-8(b)(6) and (7) apply. Subsection (6) applies to transactions in which the finance charge is computed from time to time by application of a rate to the unpaid principal balance, noting that the prepayment penalties required to be disclosed under this section principally arise in connection with prepay-

ment of real estate mortgages. Subsection (7) is designed to encompass the disclosures necessary with regard to the prepayment of an obligation involving precomputed finance charges which are included in the face amount of the obligation. The Board commented:

. . . [A]lthough in a precomputed obligation the finance charge rebate to a customer may be less when calculated according to the "Rule of 78's," "sum of the digits," or other method than if calculated by the actuarial method, such difference does not constitute a penalty charge for prepayment that must be described pursuant to § 226.8(b)(6).

12 C.F.R. § 226.818.

The initial case development of the classification of an acceleration clause under the Act is found in *Garza v. Chicago Health Clubs, Inc.*, 347 F.Supp. 955 (N.D.Ill.1972). To plaintiff's contention that a clause providing for acceleration of the entire balance under the contract upon default should be characterized as a "prepayment" under § 226.8(b)(7), the court ironically countered that the ordinary meaning of "prepayment" does not include acceleration upon default, citing as further support that § 226.8(b)(4) deals separately with "charges payable in the event of late payments," the court extracting this portion of the subsection from the complete subsection (4) quoted *supra.* The court then applied judicial decision interpretations to the word "charges", establishing a definition of "pecuniary burden or expense" and "expenses which have been incurred or disbursements made, in connection with a contract." Citing 15 U.S.C.A. § 1601 (entitled "Congressional findings and declaration of purpose") as that provision of the Act substantiating disclosure of the acceleration clause as a "charge", then, since the purpose of the statute and regulations was to inform consumers of credit costs and terms so they can effectively choose between sources of credit, the court found for plaintiff debtor.

A court in *Washington Motor Sales v. Ferreira*, 131 N.J.Super. 328, 329 A.2d 599 (1974) held *contra.* There, plaintiff credi-

tor's acceleration provision on the reverse of the contract provided that as a consequence of default, "seller may declare the unpaid balance of the contract immediately due and payable." 329 A.2d at 601. Held: "Nowhere in the above quoted statute is there any required disclosure of a potential assignee or an acceleration clause. . . . An acceleration clause does not fall within the category of additional charges, for the debtor full well knows at the commencement of the contract the full amount of the sums for which he is responsible." *Id.* at 602, 603. (Citing *Garza contra.*)

Providing general language consistent with *Garza*, though distinguishable as an open end credit transaction and thereby subject to § 226.7 of Regulation Z, *Hall v. Sheraton Galleries of Atlanta & General Electric Corporation of Georgia*, CCH Consumer Credit Guide ¶ 98,737, Civ. No. 19159 (N.D.Ga. March 21, 1974), characterized both acceleration upon default clauses and collection of attorney's fees:

> . . . [W]hatever their labels, they are charges which may be imposed against the borrowing of credit, and therefore must be disclosed pursuant to Regulation Z, 226.7(a)(6) [the conditions under which any other charges may be imposed, and the method by which they will be determined]. (Order entered June 4, 1974.)

CCH ¶ 98737 at 88,336.

Cited by CCH Consumer Credit Guide during this period were recommendations of bankruptcy judges sitting as special masters in Truth-in-Lending cases in Georgia. *Pollock v. Avco Financial Services*, CCH Consumer Credit Guide ¶ 98,766 (N.D.Ga. July 1, 1974), incorporated both the definition of "charges" and the *Garza* construction of the declaration of purpose section of the Act in holding that a right of acceleration must be disclosed pursuant to § 226.-8(b)(4) in order that consumers could more readily compare various credit terms available to them.

The state of flux of and hence relative decisional weight to be accorded such masters' recommendations awaiting review, approval, and adoption by the district courts is exemplified by *Pollock's* having been remanded on September 3, 1974, for reconsideration in light of other decisions, and thereafter dismissed by stipulation on September 5, 1974.[9]

*Pugh v. American Tractor Trailer Training, Inc.*, summarized at CCH Consumer Credit Guide ¶ 98827, Civil No. 14,109 (D.C. Conn. April 10, 1974), provided an additional rationale for the finding that an acceleration clause optional upon default must be disclosed by holding that nowhere in the acceleration statement was a borrower informed that a late payment may result in an effectively increased cost for the credit extended, in that the finance charge was not required to be reduced to correspond with the credit period as shortened by acceleration.

Two additional distinguishing elements raised by the creditor were discounted in *Meyers v. Clearview Dodge Sales, Inc.*, 384 F.Supp. 722 (E.D.La.1974). Debtor's default was first typified as a "subsequent occurrence" under § 226.6(g) of Regulation Z. (This point is discussed *infra*.) Alternatively, the creditors argued that acceleration does not constitute a "charge" under § 226.8(b)(4) because Louisiana law provided for rebate of unearned interest in the event of acceleration, resulting in no increase of the consumer's total obligation and, ergo, no "charge." Citing all cases, *supra*, the court concluded that acceleration of the balance of the debt, whether or not Louisiana law rebated unearned interest, resulted in a considerable *immediate pecuniary burden* (emphasis added) for one attempting to avoid foreclosure. Ostensibly drawing on *Garza's* construction of the declaration of purpose section of the Act, the court concurred with *Garza* that the Act intended to require the disclosure of exactly this type of credit information.

**9.** *McDaniel v. Fulton National Bank of Atlanta*, 395 F.Supp. 422, 424 n. 1 (N.D.Ga. December 1974).

Here, relying on the distinction rejected in *Meyers,* viz., that an underlying state law effecting the rebate of unearned interest upon acceleration on default permits nondisclosure of such a clause, defendant urges that subsequent authority has upheld that distinction.

Defendant's acceleration upon default provision appears on the reverse of the contract in pertinent part as follows:

10. SELLER'S RIGHTS AND REMEDIES. If Buyer defaults in complying with any of the terms or provisions hereof, . . . the full amount hereof shall at Seller's option be immediately due and payable and Seller shall have the rights and remedies of the holder of a retail installment contract under Chapter 476, Hawaii Revised Statutes . . . .

Relying on the reference to remedies available to seller under Chapter 476, H.R.S. (Hawaii retail installment sales act), defendant contends that § 476–21 thereunder provides for rebate of unearned interest upon acceleration on default as follows:

§ 476–21 Credit upon anticipation of payments. Notwithstanding the provisions of any retail installment contract to the contrary, any buyer, upon five days' prior notice to the holder, may satisfy in full at any time before maturity the debt of any retail installment contract and in so satisfying the debt shall receive a refund credit thereon for such anticipation of payments, if the finance charge has been paid in advance.

This court can in no way expand the provisions for notice and prepayment in full by buyer to include defendant's interpretation, absent legislative history or court holdings to that effect. However, under § 478–4, H.R.S., other provisions of H.R.S. are made applicable to defendant by the following language:

. . . [A]ny bank may charge . . interest, . . . at the same rates and in the same amounts as permitted by law in the case of loans made by industrial loan companies licensed under chapter 408, if in relation to the contract such bank shall be in compliance with sections

408–15 and 408–17 applicable to licensees under chapter 408.

Section 408–15(f), H.R.S., provides in part as follows:

. . . (f) Refunds; prepayment. On a contract . . . on which interest has been collected in advance, and . . on which judgment is then obtained before maturity, the industrial loan company involved shall refund to the borrower an account of unearned discount or interest an amount computed, on that portion of the principal amount which has not yet matured, at the same rate of . . . interest as was charged at the time the contract was made, for the term of the contract remaining . . . after the date of the judgment; . . .

This court finds that this provision constitutes statutory provision for the acceleration on default rebate of unearned interest which defendant claims.

In Georgia, special masters issued a considerable number of opinions from September 5, 1974 through November 4, 1974, subject to adoption and approval of the District Courts. During this period, two special master opinions were submitted and published by CCH which eventually resulted in partial reversal and the purported establishment in Georgia of the leading cases (from three consistent opinions) on the issue of proper disclosure of acceleration on default.

The special master in *Barksdale v. People's Financial Corporation of Alpharetta,* 393 F.Supp. 112, CCH Consumer Credit Guide ¶ 98742, appearing in periodic report letter of October 8, 1974, (N.D.Ga.1974), aligned closely with *Garza* in reasoning that if a creditor has a right to assess a charge automatically, without other conditions, that right must be disclosed as a charge under Regulation Z. He held that the right of acceleration is a "charge" as a matter of law and must be disclosed pursuant to § 226.8(b)(4).

In *McDaniel v. Fulton National Bank of Atlanta,* 395 F.Supp. 422, CCH Consumer Credit Guide ¶ 98,683, published in periodic report letter of January 14, 1975 (N.D.Ga. 1974), the special master sought to overrule

and distinguish previous cases on a number of theories. He concluded: (1) previous decisions' reference to § 102 (declaration of purpose section of the Act) as the authority for requiring disclosure of acceleration clauses because of their meaningfulness to consumers was improper; (2) the consequences of default, including repossession, remedies under UCC Article IX, deficiency judgment, and acceleration of debt leading thereto were not credit disclosures which Congress specified; (3) there must be an "addition" after default to the amount of payments otherwise due to require disclosure; (4) acceleration upon default is a contractual remedy; (5) under any circumstances, debtor is charged only for actual earned portions of the finance charge upon acceleration because of applicable Georgia law providing for automatic rebate of unearned interest.[10]

The district court on December 18, 1974,[11] approved the special master's findings to the extent that acceleration on default in the state of Georgia cannot constitute a "charge" because of the statutory provision for rebate of unearned interest upon acceleration on default. The court cited as additional authority, arising following the special master's opinion, *Grant v. Imperial Motors,* summarized in CCH Consumer Credit Guide ¶ 98,620, Civil No. 3146 (S.D.Ga. December 4, 1974), in which the acceleration upon default provision involved rebate of unearned charges by the terms of the agreement rather than impliedly relying upon Georgia law. *Grant* commented that acceleration was more in the nature of a remedy of the creditor rather than a charge imposed on the debtor, but retreated from that view to the extent of stating that the result would be different if no unearned charges were rebated.

The following spectrum of special master recommendations were also submitted: *Wiggs v. BMA Investment Co.,* summarized

at CCH Consumer Credit Guide ¶ 98,676, published in periodic report letter of January 28, 1975 (N.D.Ga.1974) (acceleration clause in installment loan agreement is a contractual right and not a charge that must be disclosed under the Act); *Houston Jr. v. Atlanta Federal Savings and Loan Association,* summarized at CCH Consumer Credit Guide ¶ 98,687 under periodic report letter of January 14, 1975, (N.D.Ga. September 24, 1974) (reliance on general provisions of § 102 is not proper; if Act had intended right of acceleration to be disclosed, it would have so provided; a reasonable interpretation of "charge" would not include a future right which could not be determined until such time as requisite default or delinquency in payment occurred); *Hamlet v. Beneficial Finance Co.,* CCH Consumer Credit Guide ¶ 98,646, published in periodic report letter of March 11, 1975, Civil No. C74–821A (N.D.Ga. November 4, 1974) (under state law, an acceleration could not result in the collection of any more interest than the lender was entitled to for the time the loan was outstanding; there could thus be no delinquency charge upon acceleration, and so there was no charge to disclose).

Interspersed with these decisions and recommendations came the publishing of Federal Reserve Board Letter No. 851 of October 22, 1974, excerpted in CCH Consumer Credit Guide ¶ 31,173 at 66525, published in periodic report letter of January 14, 1975:

For the purposes of Truth in Lending disclosures, this staff views an acceleration of payments as essentially a prepayment of the contract obligation. As such, the disclosure provisions of § 226.8(b)(7) . . . which require the creditor to identify the method of rebating any unearned portion of the finance charge or to disclose that no rebate would be made, apply. If the creditor rebates under one method for acceleration and another for

---

10. See special master's opinion, CCH Consumer Credit Guide ¶ 98,683 at 88,257–65.

11. 395 F.Supp. 422. The December 18, 1974 portion of this opinion was rendered by the court while awaiting the recommendations of the special master as a result of remand of the case on the question of the impact of FRB letter 851 on the special master's September 19, 1974 recommendation.

voluntary prepayment, both methods would need to be identified under § 226.-8(b)(7). Failure to disclose the method of rebate or nonrebate would be a violation of the Truth in Lending Act.

If, under the acceleration provision, a rebate is made by the creditor in accordance with the disclosure of the rebate provisions of § 226.8(b)(7), we believe that there is no additional "charge" for late payments made by the customer and therefore no need to disclose under the provisions of § 226.8(b)(4). On the other hand, if upon acceleration of the unpaid remainder of the total of payments, the creditor does not rebate unearned finance charges in accordance with the rebate provisions disclosed in § 226.8(b)(7), any amounts retained beyond those which would have been rebated under the disclosed rebate provisions represent a "charge" which should be disclosed under § 226.8(b)(4).

On its face the letter contains one clear inconsistency! In the first paragraph cited, *supra,* the Director indicates that if two different methods are used for rebate under acceleration and voluntary prepayment, respectively, both methods would need to be identified. However, in the second paragraph, he requires disclosure only for "charges" arising if the method of rebate upon acceleration involves retention of funds "beyond" those rebated under the voluntary prepayment method. Therefore, if the rebate under the method used upon acceleration equals or exceeds the rebate under the method used for voluntary prepayment, by the second paragraph, there need be no disclosure. Arguably, the application of Interpretation 226.818 to letter 851 also tends to undermine the conclusion of the letter. § 226.818 would find no penalty charge requiring disclosure in a precomputed finance charge transaction in which the method of rebate of unearned interest upon prepayment did not produce the same rate of or amount of rebate as would be realized under the actuarial method. This position could be used to support the proposition that so long as rebate of unearned interest is made upon acceleration

upon default whatever the method employed, disclosure would not be required, the only exception being in those circumstances in which no rebate of unearned interest is made, which circumstance in the instance of prepayment of the obligation must be disclosed under 226.8(b)(7). The impact of this inconsistency and the general conclusion of letter 851 is discussed, *infra.*

From these cases and recommendations arising prior to the instant transaction, some of which were published *after* the date of the transaction, defendant faced a milieu of competing considerations and rationales.

From *Garza, Hall, Pugh* and *Meyers* evolved the argument and authority against defendant's contention of the validity of non-disclosure by reason of statutory rebate of unearned interest. Counterbalancing this line of authority was *Washington Motor,* discussed *supra.* Special master recommendations ran the gamut from *Barksdale's* reiteration of the *Garza* reasoning, through *McDaniel's* and *Hamlet's* exculpation by operation of state rebate law, to *Wiggs'* acceleration as a remedy, not a charge, and *Houston's* finding no provision for acceleration disclosure in the Act.

*Woods v. Beneficial Finance Co. of Eugene,* 395 F.Supp. 9 (D.Ore.1975), inaugurated the new year by refusing to deal in the semantical distinctions of *Garza* and its progeny as to equation of acceleration with "charge" when there is in fact no additional total financial cost imposed, but found persuasive the "immediate pecuniary burden" rationale of *Meyers.* The court held that the creditor need not disclose a right of acceleration as an additional "charge" as such, but that the right of acceleration is an obvious concern to a borrower within the "meaningful disclosure" language of the declaration of purpose section of the Act, and consequently the creditor must disclose and fully explain any right of acceleration in order to comply therewith. 395 F.Supp. at 16. The Oregon court thereby refused to burden itself with applying or at least construing the specific disclosure provisions of the Act and Regulation Z. Instead, the

court invoked the general provisions of the declaration of purpose of the Act as the criteria and authority compelling the disclosure of the right of acceleration.

The district court opinions in *Barksdale,* 393 F.Supp. 112 (N.D.Ga.1975), *Barrett v. Vernie Jones Ford, Inc.,* 395 F.Supp. 904 (N.D.Ga.1975) (reconsidered May 8, 1975), and *McDaniel,* 395 F.Supp. 422 (N.D.Ga. 1974) (Supplemental Opinion May 13, 1975), comprise a triumvirate of cases in that judicial district so interrelated by citation and reference back as to be best considered together. The special master recommendations in *Barksdale* and *McDaniel* have been discussed, *supra. Barksdale* differs in fact situation in that the acceleration clause provides that "all of said note and all installments of principal and *earned finance charge then unpaid* are immediately due and payable." 393 F.Supp. at 114 (emphasis added). Citing the *McDaniel* December 18, 1974 opinion portion and *Grant* as authority, in refusing to adopt its special master's recommendations, the court held that the *McDaniel* language:

> an acceleration of the loan by the creditor here would not obligate plaintiff [debtor] to pay any additional charge that did not appear on the face of the disclosure sheet [12]

was the conclusive result of the application of Georgia law directing rebate of unearned interest upon acceleration. The court concluded as a matter of law there is no violation of § 226.8(b)(4) from the fact that the defendant's contractual acceleration remedy in the event of default was not set forth on the front of the disclosure statement. As will be seen in the analysis of *McDaniel, infra,* the court made a decision-saving footnote:

> Indeed, notwithstanding the Georgia law as to what portion of the face value of an

installment note may be accelerated for default, the option in this case is expressly limited to the "principal and earned finance charge than unpaid." [13]

Without this footnote, which is cited as the holding in *Barksdale* by *Barrett* and *McDaniel's* May Supplemental Opinion, *infra,* the reversal of *McDaniel's* December opinion by the Supplemental Opinion would have rendered the *Barksdale* decision without authority in its primary reliance on the impact of Georgia unearned interest rebate law as to acceleration on default clauses.

*Barrett* next weighed the developing Supplemental Opinion of *McDaniel.* The acceleration clause in *Barrett,*[14] as in *McDaniel,*[15] gave seller the option to declare all unpaid installments immediately due without providing for rebate of unearned interest. *Barrett* found that FRB letter 851 was applicable in that the acceleration clause did not provide for unearned interest rebate and that disclosure under § 226.-8(b)(4) was required. To defendant's contention that the transaction in the case was pre-letter 851, the court alternatively found that the diminution of the period over which the finance charge would be spread constituted a "charge" which is passed on to the consumer as a result of default, and hence required disclosure, citing *Garza* and the since reversed district court decision in *Johnson v. McCrackin-Sturman Ford, Inc.,* 381 F.Supp. 153 (W.D.Penn.1974). *Barrett* then overruled the December *McDaniel* opinion by discounting the impact of state law as a "silent provision" to the disclosure requirements under the Act, relying as did *Garza, et al,* on the declaration of purpose general provision to conclude:

> . . . [I]rrespective of how this acceleration clause might fare if an attempt was made to enforce it in the state

---

12. 393 F.Supp. at 114, quoting *McDaniel,* 395 F.Supp. 422, 424.

13. *Id.* at 114, n. 3.

14. 395 F.Supp. at 906: "In the event of a default: Seller shall have the right to: (i) declare all unpaid installments immediately due . . .."

15. 395 F.Supp. at 425: "In the event of a default hereunder, all unpaid installments and indebtedness secured hereby may, at the option of Seller and without demand or notice of any kind, be declared and thereupon immediately shall become due and payable . . . .."

courts, the Truth in Lending Act and its implementing regulation, 12 C.F.R. § 226.8(b)(4), require that an acceleration clause be properly disclosed when, as here, by its terms it authorizes the creditor to demand immediate payment of future installments including unearned interest and finance charges upon default. 395 F.Supp. at 909.

On motion for reconsideration, *Barrett* further clarified the inapplicability of Georgia law by commenting, "under neither [Georgia] Act will the Georgia court 'read into' a silent acceleration clause a provision rebating all unearned interest." *Ibid.* The court instead described the operation of Georgia law as compelling rebate of unearned interest, and possibly any finance charge, delinquency or collection charges on the contract if, upon tender for judgment in the state courts, the application of the acceleration provision in the contract at the time judgment was sought resulted in a usurious rate of interest. The court hypothesized that under certain factual situations, acceleration could be obtained, unearned interest could be withheld from rebate, but the usury standards of Georgia law would not be violated.[16] The Truth in Lending Act, however, would require disclosure where there was withholding of any unearned interest. Ignoring the impact of Georgia law, then, the court reemphasized, "Thus the crucial inquiry is what charges has the lender asserted a right to collect under the terms of his note, not what will be the outcome of an attempt to enforce these charges in the state courts." *Id.* at 911. Extending that conclusion, the court indicated that the disclosure of a clearly usurious 50 percent interest rate would not contain a Truth in Lending violation if that interest rate was clearly disclosed.

There followed the *McDaniel* Supplemental Opinion of May 13, 1975. 395 F.Supp. at 424. In response to *Barrett, McDaniel* altered its conclusion by stating, "if acceleration does not create an additional charge, and if the creditor does not assert the right to accelerate the note as to create a potential additional charge through the acceleration of unearned interest, there is no violation of the Truth in Lending Act." *Id.* at 425–426. The court then held that the note in question contained an additional charge to the extent that acceleration effectively increased the true annual rate of interest of the note, which increase had not been disclosed at the inception of the transaction. Again relying on the declaration of purpose section of the Act, the court found there is a requirement of disclosure of all charges which the lender asserts a right to collect at the time credit is extended whether or not it is finally determined that he can utilize the enforcement mechanisms of the state courts to collect the charge.

In the most recent acceleration case in Georgia, *Morris v. First National Bank of Atlanta,* Civ. C74–1494A (N.D.Ga. November 7, 1975), rejected without analysis the special master's argument supporting the imposition of § 226.6(g) as controlling and also the master's analysis of the development of the Act in Congressional hearings and conclusion that Congress recognized the prevailing state statutory provisions providing for individual installment late payment charges and specifically provided for disclosure of same in 15 U.S.C.A. § 1638(a)(9). Instead, the court held *Barrett, Barksdale, McDaniel, Meyers, et al* as controlling.[17]

The Third Circuit reversed the district court in *Johnson v. McCrackin-Sturman Ford, Inc., supra,* 527 F.2d 257, CCH Consumer Credit Guide ¶ 98,499 (3d Cir. December 16, 1975), holding as urged by defendants in the instant case that a state statutory provision for rebate of unearned interest upon acceleration was considered incorporated into the provisions of applicable contracts, that the net effect of the operation of such a statute would be to impose no additional charge upon a debtor on acceleration upon default, and that therefore no disclosure of an acceleration provision operating under such a state law would be re-

16. See illustrative example by *Barrett,* 395 F.Supp. at 910 n. 2.

17. See 4 CCH Consumer Credit Guide ¶ 98,568 (special master's opinion in full text).

quired by the Act. The court criticized *Garza* and the lower court for considering the term "charges" apart from the language which modified it in § 226.8(b)(4) on the premise that those courts employed a method of analysis which is inconsistent with well established principles of statutory interpretation and further ignored the generally established meaning in the commercial credit field of default and delinquency charges as those specific pecuniary sums that are assessed against the borrower solely because of his failure to make his payments in a timely manner, and which are extensively enacted in state statutes providing for the payment of specific monetary sums, in addition to the amounts already due under the loan, that are imposed because of late payment of an installment or installments. The operation of Pennsylvania's statutory rebate was held by established principles to be incorporated into the contract acceleration provisions, thus placing these provisions within the purview of letter 851 in that no disclosure under § 226.-8(b)(4) was required in the absence of an "additional charge."

In an opinion issued upon motion to reconsider, Judge Wong in *Kessler v. Associates Financial Services Company of Hawaii, Inc.,* 405 F.Supp. 122 (D.Haw.1975), applied a standard of reasonableness to defendant's actions in light of the Act, regulations, interpretations, and case law in existence at the time of the transaction. The court found that *Garza* was the only case handed down by the courts and cited by parties in the case, and that *Garza's* requirement of disclosure arose implicitly from a particular interpretation of Regulation Z, § 226.-8(b)(4). Since *Garza* had not dealt with a fact situation in which state law required refund of unearned interest upon acceleration, defendant could not be held to that particular interpretation of § 226.8(b)(4). The court envisioned lenders attempting to protect themselves by adequate disclosure in conjuring every possible ramification of interpretations, producing disclosure statements which both differed from lender to lender and contained an excessive and confusing number of provisions. After holding

for defendant lender under the above analysis, *Kessler* went on to indicate that under the weight of the Georgia case opinions, and particularly invoking the declaration of purpose provisions of the Act, prospective application of the decision would call for disclosure of an acceleration clause which does not contain therein a provision for rebate of unearned interest. The weight of the *Johnson* decision would of course, but for the holding of this court, have accorded prospective authority to *Kessler.*

This court, however, is compelled to find that the prospective effect of the instant case, as well as the holding herein, must rest on the misplaced and overreaching application of the declaration of purpose provision of the Act as originally applied by *Garza* and subsequently followed virtually unanimously by case decisions, as well as the failure of the courts to invoke and apply § 226.6(g) in conjunction with consideration of the interpretation of § 226.8(b)(4) and § 226.8(b)(7) by the staff of the Federal Reserve Board in opinion letter 851.

With regard to the application of 15 U.S.C.A § 1601, the special master in *McDaniel* provided excellent and compelling analysis:

> However, § 102 [15 U.S.C.A. § 1601] should not, of itself, be used by the courts to find violation of the Act where the Act otherwise fails to set out a specific requirement for creditor compliance.
>
> It is § 129 of the Act [15 U.S.C.A. § 1639] that specifies the disclosures applicable in ordinary loans such as that involved in the instant case.
>
> It is § 129, rather than § 102, where a disclosure violation must be lodged.
>
> The specific provisions of the Act and Regulations regarding disclosure requirements should be complied with precisely by creditors to provide the correct credit information and uniformity in terminology which Congress mandated. But the stringent disclosure requirements of § 129 should not be enlarged beyond the specific terms of the Act and Federal Reserve Board regulations simply to con-

form to some judicial notion as to the congressional purpose and intent which may be revealed in § 102. The test is not what a court may consider more beneficial, informative, and understandable to the borrower than the specific requirements of the Act and Regulations. That is the province of the legislative branch. The test to be applied in determining whether a violation exists is whether there has been compliance with the specific requirements of the Act and the Regulations of the Federal Reserve Board promulgated under broad powers in the light of commercial realities. (Footnotes omitted.)

4 CCH Consumer Credit Guide ¶ 98,683 at 88,259. (The lengths to which § 1601, to the expressed exclusion of the remainder of the Act and Regulation Z, has been invoked to justify disclosures concluded to have been required under the Act is most amply demonstrated in *Woods, supra.*)

Application of § 102 in *Kessler,* citing the general provisions as to meaningful disclosure of credit terms to void the consumer's uninformed use of credit, carried with it an equally compelling rebuttal against such an application, when considering the impact of case decisions:

> . . . [L]enders would be put to the task of conjuring up the various requirements that a regulation may be interpreted to require and would be compelled to include on the disclosure statement all such possibly required disclosures. Thus, disclosure statements would differ from lender to lender, which would defeat the ease of comparing credit terms—the essential purpose of the Act. Moreover, if it were the rule that the lender was liable for all subsequent requirements that the courts read into imprecise Truth-in-Lending regulations, lenders, in order to protect themselves, would disclose all the terms contained in the promissory note. As a result, the disclosure statement and the note would become identical. Hence, another essential policy of the Truth-in-Lending Act—the disclosure for the pur-

pose of easy reference of only certain critical terms and provisions of the loan— would be defeated by the confusing and obfuscating inclusion of every term and provision.[18]

█ No more forceful arguments could be made that creditors should be held only to the specific provisions of the Act, Regulation Z thereunder, formal interpretations, and appropriate consideration of staff opinion letters issued thereto.

█ The invocation of § 102 having been found improper to justify imposition of disclosure requirements, for plaintiff's claim thereon to be upheld, acceleration upon default must either be incorporated under § 226.8(b)(4) as a "similar charge" or, by board opinion letter 851, into § 226.8(b)(7) interpreted as essentially a prepayment of the obligation. Neither of these approaches, however, gives any weight or credence to § 226.6(g) and the explanatory footnote appended thereto.

*Meyers* discounts the effect of § 226.6(g) as rendering § 226.8(b)(4) a nullity, reasoning that all delinquency-type charges are contingent upon such post-disclosure acts, namely, the failure to make timely payments. The special master in *Morris* (subsequently reversed by the district court) provides an alternative and more persuasive argument on the interrelationship of 226.8(b)(4) and 226.6(g). 4 CCH Consumer Credit Guide ¶ 98,568 at 88,071–78. The master first discusses at length the development of the provisions of § 226.8(b)(4) as being a logical inclusion in the Act in view of statutory operation of such automatic late payment charges imposed on each late installment in the applicable state retail installment contract acts. The master then returns to the argument that a reserved right to accelerate late payments on default is the same logical category as the creditor's rights of repossession, foreclosure, and sale on default. He finds further distinction in the Board's use of "similar charges" in § 226.8(b)(4) as indicating that Congress intended to require disclosure of all charges

---

18. Kessler Memorandum Opinion and Order on Motion to Reconsider at 405 F.Supp. at 126.

which are directly attributable to the act of making "late payments", that is, charges commonly considered as default or delinquency charges in the consumer financing industry.

The CCH Consumer Credit Guide discussion of the relationship between delinquency charges and acceleration on default is submitted by the master (1 CCH at 4083–84):

> [Compiled from a general background of existing state Truth-in-Lending laws] ¶ 4230. Delinquency charges. Delinquency charges—like deferral charges—are the compensation a creditor receives on a precomputed contract for the debtor's delay in making timely installment payments. ¶ 4231. Consumer credit sales. Because a precomputed contract is the only one prepared on the assumption that the debtor will make all payments when due, the creditor is left without any income for a period where payment is delayed. *In lieu of accelerating the maturity of the entire obligation,* the creditor may make an appropriate charge just for the delay on the particular installment. (Emphasis added.)

*Johnson* approached § 226.6(g) language and also flirted with distinguishing acceleration from prepayment of the obligation to unconsciously refute letter 851 by stating: "Except that a specified event in the condition precedent to its exercise, a creditor's right of acceleration is, in essence, akin to the borrower's right of prepayment." 527 F.2d 257, at 264, CCH ¶ 98,499 at 87,964.

The crowning example of ignoring § 226.6(g) is found in the following characterization by *Barrett* of the fact situation in that case:

> Here the creditor has included an acceleration clause in his note which has the effect upon the occurrence of certain contingent future events of obligating the borrower to pay a finance charge in excess of the percentage rate actually disclosed. 395 F.Supp. at 911.

While summarizing 226.6(g) with near precision, the court failed to recognize the applicability of the provision.

If § 226.8(b)(4) is read as applying to disclosures of automatic late installment payment penalties exclusively without inclusion of the court-added acceleration clause interpretation, then the reading together of the two regulatory provisions refutes *Meyers'* nullifying construction. As it was unconsciously refuted in *Garza* (347 F.Supp. at 959) in 1972, this court, too, finds the FRB's one-sentence conclusion in letter 851, viz., that acceleration is essentially a prepayment of the obligation under § 226.8(b)(7), to be clearly erroneous in view of the express provisions of § 226.6(g) and its accompanying footnote.

This court holds that optional acceleration upon default by the creditor constitutes a "subsequent occurrence" under § 226.6(g) of Regulation Z. Disclosure of such a provision is therefore not mandated by Regulation Z and summary judgment is entered for defendant on this issue.

## ISSUE V

### FINANCE CHARGE ITEMIZATION

■ Plaintiff's motion for summary judgment alleged that defendant failed to adequately describe and itemize the finance charge consisting of the add-on interest of the contract. Additionally, as argued before this court and presented in closing briefs, plaintiff maintains that defendant also failed to include title transfer fees and duplicate registration and license fees in the amount of the finance charge, which would have required individual itemization therein. This issue is discussed *infra,* ISSUE VI, as it also relates to other required terms of disclosure.

15 U.S.C.A. § 1638(a)(6) applies to non-open end credit sales and provides:

> (a) . . . the creditor shall disclose each of the following items which is applicable: . . . (6) . . . the amount of the finance charge, which may in whole or in part be designated as a time-price differential or any similar term to the extent applicable.

The pertinent subsection of Regulation Z, § 226.8(c)(8)(i) provides:

(c) . . . the following items, as applicable, shall be disclosed:

. . . (8) . . . (i) The total amount of the finance charge, with description of each amount included, using the term "finance charge," . . .

FRB staff opinion letter No. 682 of April 25, 1973, addressed the factual situation in which the only item of the finance charge is an add-on finance charge and stated in part:

. . . what must be disclosed in a typical retail installment sales contract where the only finance charge is an "add-on" finance charge and there are no other components of the finance charge . . . whether it is sufficient to simply disclose the words "finance charge" together with the dollar amount of the charge, or whether the disclosure must contain an explanation that the finance charge is an add-on type finance charge and contains no other component.

. . . [I]t would be proper to simply disclose the dollar figure labeled as the "finance charge." The requirement of disclosure of "each amount included" is applicable only where the total amount of the finance charge includes more than one component . . . it would be preferable for the creditor not to obscure the clear impact of the disclosure of the "finance charge" by adding additional verbiage . . . . Such an addition could, in fact, violate § 226.6(c) which prohibits adding information which is "stated, utilized, or placed so as to mislead or confuse the customer or contradict, obscure, or detract attention from the information required by this Part to be disclosed." [19]

Although dealing with a non-sale credit loan, letter 682 construes regulatory language of § 226.8(d)(3) identical to § 226.-8(c)(8)(i) applicable here.

Subsequent to the instant transaction, FRB Interpretation 226.820 was issued, interpreting both regulatory subsections set forth, *supra.* After stating the purpose of the regulations in terms paralleling the declaration of purpose provision of the Act, the Board stated (40 Fed.Reg. 55635 (1975)):

A description of the amounts included in the finance charge is necessary to carry out the purposes of the Act only when the total charge includes more than one element. Therefore, where only a single type of charge comprises the finance charge, disclosure of the total dollar amount of such charge, using the term "finance charge," complies with the requirements of § 226.8(c)(8)(i) . . . and there is no further requirement under those sections that the single type of charge be otherwise identified or described.

To rebut letter 682, plaintiff urges the position taken in *Johnson v. Associates Finance, Inc.,* 369 F.Supp. 1121 (S.D.Ill.1974), in which the parties agreed that a finance charge listed in a disclosure statement included interest only, and no other additional fee or charge. Though not specifying what language would satisfy the disclosure requirements of § 226.8(d)(3), the court held that the defendant was required in all cases to disclose individually the existence and amount of each component part or parts of the finance charge. To hold otherwise, indicated the court, would permit the defendant to undermine the basic scheme of disclosure in Regulation Z by permitting the highly ambiguous term "finance charge" to possibly denote not one type of charge, but a whole host of fees. 369 F.Supp. at 1122.

The *Meyers* decision upheld *Johnson v. Associates Finance* in applying that decision to § 226.8(c)(8)(i). *Johnson v. Associates Finance* and *Meyers* also constituted sole authority for a similar finding in *Ives,* the court there noting and distinguishing *Adams v. New Haven U. I. Federal Credit Union,* CCH Consumer Credit Guide ¶ 98,-619, Civil No. 15–632 (D.C.Conn. March 14, 1975), in that the single item finance charge in *Adams* was sufficiently described else-

---

**19.** *CCH Consumer Credit Guide* Transfer Binder (Special Releases-Correspondence April 1969—April 1974) ¶ 30,927 at 66,427.

where on the disclosure statement as interest.

*Johnson v. Associates Finance* was cited as sole authority for describing a finance charge consisting only of interest as such in *Woods,* which found that an asterisk reference to a comment that "finance charge" was interest computed sufficient to place the disclosure within the regulation. (*Adams* and *Woods* might have run afoul of § 226.6(a) as to whether such references appeared in meaningful sequence if that issue had been raised.)

In *Agbayani v. Safety Loan Company, Ltd.,* Civil No. 75–0191, D.Haw., September 22, 1975, as amended September 24, 1975, Judge Wong gave *Johnson v. Associates Finance* similar weight, the court noting same and requiring further description of the finance charge in the court's first order, and not citing any statutory authority or basis of decision in the amended order. Neither *Woods* nor *Agbayani* show any consideration of FRB letter 682.

This court holds that the interpretation afforded Regulation Z by FRB letter 682 is reasonable, consistent, and not clearly erroneous, and thus where reasonable minds might differ as to same, should be accorded due deference by the courts. The soundness of the staff opinion interpretation is confirmed by the November 1975 issuance of formal interpretation § 226.820.

Summary judgment is entered for defendant on this issue.

### ISSUE VI

### TITLE TRANSFER FEE, CERTIFICATE OF REGISTRATION AND OWNERSHIP REPLACEMENT FEE

■ Incident to his assertion of improper itemization of the finance charge, plaintiff raised in oral argument and both parties responded in closing briefs to the question of whether defendant's notation in item 7 of the Statement of Charges (TITLE TRANSFER AND/OR RECORDING FEES), "Included", (referring to inclusion of such fees in the total cash price), constituted a violation of the Act and Regulation Z in that the fees should have either been disclosed as "other charges" or itemized as part of the finance charge. This court has judicially noted that a $1.00 title transfer fee is imposed by state law, is charged the transferee of the title or interest of a legal owner upon presentment of the transfer papers, and includes within the fee the issuance of new certificates of ownership and registration. The dealer also included in the total cash price a $2.00 fee imposed by state law for the replacement of lost or defaced certificates of ownership and registration. Such replacement by the dealer was mandated in this transaction as a prerequisite to the sale.

Plaintiff urges that § 226.4(b)(4) applies in the instant case and therefore the $1.00 title transfer fee should have either been separately itemized under § 226.4(b)(4) or included in the finance charge, and individually itemized thereunder; the $2.00 replacement fee should have been included in the finance charge. Defendant maintains that none of the above described fees were charged incident to the extension of credit, did not require separate itemization under any other provisions of the Act and Regulation Z, and were therefore properly included in the cash price, item 1 of the Statement of Charges of the contract.

*Are Statutory Fees a Finance Charge Under § 226.4(a) and (b)?*

15 U.S.C.A. § 1605 provides:

Determination of finance charge—definition

(a) Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit  .   .  . .

.    .    .    .    .

Items exempted from computation of finance charge in all credit transactions

(d) If any of the following items is itemized and disclosed in accordance with the regulations of the Board in connection with any transaction, then the creditor need not include that item in computation of the finance charge with respect to that transaction: . . . (4) Any other type of charge which is not for credit and the exclusion of which from the finance charge is approved by the Board by regulation.

Section 226.4 of Regulation Z differs somewhat in its definition under subsection (a) in that it describes the sum of all charges as being an incident to *or as a condition of* the extension of credit. (Emphasis on portion added.) The Board further provides that the charges fall under the regulation:

> whether paid or payable by the customer, the seller, or any other person on behalf of the customer to the creditor or to a third party, . . .

In subsection (b), "Itemized charges excludable," the Board provides that if itemized and disclosed to the customer, any charges of the following types need not be included in the finance charge (12 C.F.R. 226.4(b)):

> (1) Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction.
>
> (2) The premium payable for any insurance in lieu of perfecting any security interest otherwise required by the creditor in connection with the transaction, if the premium does not exceed the fees and charges described in subparagraph (1) of this paragraph which would otherwise be payable.
>
> (3) Taxes not included in the cash price.
>
> (4) License, certificate of title, and registration fees imposed by law.

Analysis of FRB staff opinion letters and case decisions illustrates the legal confusion

emanating from application of subsections of Regulation Z without due regard to the specific language of the subsection and the interrelationships of the several sections of Regulation Z.

FRB staff opinion letters have generally applied the "incident to or a condition of the extension of credit" general rule of § 226.4(a), labelled as such at the head of the subsection. For examples, note (1) the FRB letter 60, August 7, 1969,[20] stating that "documentary fees" charged by dealers for obtaining buyer's title and license plates and for performing related services in either cash or credit transactions did not meet the general test of a finance charge under § 226.4; (2) FRB letter 623, August 9, 1972,[21] permitting inspection fee required by state law, documentary and make-ready fee retained by dealer, and state sales tax to be included in cash price, or "other charges [§ 226.8(c)(4)] (if financed)" (Board's parens) because not imposed as a condition of or incident to extension of credit; (3) the unnumbered letter of January 23, 1973,[22] stating that documentary preparation and make-ready fees are not within the general rule of § 226.4 as a finance charge.

However, the FRB staff opinions also produced inconsistencies in the application of the general rule of § 226.4(a) in stating that statutorily imposed title transfer and registration fees should be separately itemized under § 226.4(b), even though such fees were imposed whether or not the transaction was for cash or credit. For examples, (1) the letter 330 of May 21, 1970,[23] stated that charges similar to those in letter 60, *supra,* were permitted to be included in cash price, but fees imposed by law for license certificate of title or registration must be included in the finance charge or separately itemized under § 226.4(b); (2) letter 623, *supra,* said that a title application fee imposed by state law and collected by the dealer as designated agent of the state,

---

**20.** CCH Consumer Credit Guide Special Correspondence Transfer Binder ¶ 30,123.

**21.** *Id.,* ¶ 30,872.

**22.** 4 CCH Consumer Credit Guide ¶ 30,935.

**23.** CCH Consumer Credit Guide Special Correspondence Transfer Binder ¶ 30,385.

*where the dealer retained a portion of the same as commission* (emphasis added), was required to be itemized or included in the finance charge. If any consistency is to be discovered therein, it would appear only if the letter is read as finding by implication that the fee was imposed by state law only in credit transactions.

The letter 609 of June 8, 1972,[24] provides the more persuasive analysis of the interrelationship of § 226.4(a) and (b):

> The general rule, and not the fact that "taxes" must be itemized to be excluded under § 106(d)(3) of the Act [15 U.S.C.A. 1605(d)(3) *cf.* 12 C.F.R. § 226.4(b)(3)] should, in the staff's view be controlling on the issue of what is a finance charge.[25]

Nevertheless one finds that *Meyers,* citing *Starks v. Orleans Motors, Inc.,* 372 F.Supp. 928 (E.D.La.1974), *affirmed* 500 F.2d 1182 (5th Cir. 1974), rejected the application of the general rule of § 226.4(a) to a $15.00 "tag, title, and fee" from the cash price, and instead applied § 226.4(b)(4) to require separate itemization in order to be excluded from the finance charge. *Starks* similarly applied § 226.4(b)(4) in rejecting inclusion of an identical fee in the cash price, relying on the specific prohibition in § 226.2(i) (definition of cash price) against inclusion of any § 226.4 charges. That court ignored, completely, the application of the general rule provision of § 226.4(a).

Out of the above indicated quagmire of confusion, this court must conclude that staff opinions 330 and 623, *supra,* as well as the Louisiana cases, misconstrued § 226.4(a) and (b). Factually, nearly each opinion and case described fees imposed by the dealers for "preparation" or "documentation" which were not exclusively statutorily imposed fees, such as found in the instant case. While the FRB staff and courts may have felt that the dealers were hiding finance charges in the cash price, nevertheless the findings of fact in each instance concluded that the fees were charged in both cash and credit transactions. When so construed, then the general rule of § 226.-

4(a) would negate a finding of a finance charge; this would thereby preclude any consideration of the provisions of § 226.4(b). Thus, here the $2.00 statutory document replacement fee would not constitute a finance charge under § 226.4(a).

## Are Statutory Fees An "Other Charge" Under § 226.8(c)(4)?

Regulation Z defines "cash price", 12 C.F.R. § 226.2(i):

> . . . the price at which the creditor offers, in the ordinary course of business, to sell for cash the property or services which are the subject of a consumer credit transaction. It may include the cash price of the accessories or services related to the sale such as delivery, installation, alterations, modifications, and improvements, and may include taxes to the extent imposed on the cash sale, but shall not include any other charges of the type described in § 226.4.

Any argument that the cases and opinions cited *supra,* in the face of the adverse ruling here that the three $1.00 fees did not constitute finance charges under § 226.4, would alternatively mandate separate itemization under § 226.8(c)(4), which requires disclosure of "all other charges, individually itemized, which are included in the amount financed but which are not part of the finance charge", is "answered" by the unnumbered letter of January 23, 1973, *supra.* There the Board staff showed no preference: ". . . [F]ees could be included in the cash price under § 226.2(i) and the disclosure of § 226.8(c)(1) or they could be included in other charges under § 226.-8(c)(4). The Regulation does not prescribe one treatment over the other." ¶ 30,935 at 66,409.

In the instant case, the facts show that the dealer by necessity incurred the $2.00 document replacement fee in order to obtain documents required by law for the sale and transfer of title of the automobile. No

**24.** *Id.,* ¶ 30,853.

**25.** *Id.,* at 66,372.

extensive speculation is required to perceive the dealer also handled the execution of entries on the registration and ownership certificates and submitted them along with the $1.00 statutory fee as a courtesy to buyers, this latter act being statutorily imposed on the transferee. The inclusion of these fees in the cash price is certainly not astonishing or reprehensible, as the dealer passes on this cost to the buyer whether or not the transaction is for cash or credit. The dealer makes no profit out of it. Certainly the dealer is given far more latitude to impose his own arbitrary fees under the definition of cash price in establishing the cost of "accessories or services" relating to "delivery, installation, alterations, modifications, and improvements."

This court agrees with defendant that § 226.4(a) defines "finance charge" in the context of charges payable as an incident to or as a condition of the extension, of credit, that the excludable itemized charges provision of § 226.4(b) operates only after such finding. Thus the statutory fees in the instant case, which are imposed whether or not the transaction is for cash or credit, do not meet the basic criteria of a "finance charge" within § 226.4(a). This court further finds that the three $1.00 fees imposed here were properly included in the cash price under the definition of same in § 226.-2(i). Therefore, separate itemization and disclosure was not required under § 226.-8(c)(4).

## ISSUE VII

### DISCLOSURE OF "UNPAID BALANCE"

█ Plaintiff urges that defendant's contract omits the item "unpaid balance" in the Statement of Charges, such item being mandated by the Act and Regulation Z in the instant case. Defendant's contract lists the items set forth in the statement of facts, *supra.*

Defendant urges that the "unpaid balance" entry set forth in Regulation Z is not applicable to his transaction because his contract shows no "other charges" or "pre-paid finance charges", thereby permitting omission of an "unpaid balance" entry.

15 U.S.C.A. § 1638(a) provides:

(a) . . . the creditor shall disclose each of the following items which is applicable:

(1) The cash price of the property or service purchased.

(2) The sum of any amounts credited as downpayment (including any trade-in).

(3) The difference between the amount referred to in paragraph (1) and the amount referred to in paragraph (2).

(4) All other charges, individually itemized, which are included in the amount of the credit extended, but which are not part of the finance charge.

(5) The total amount to be financed (the sum of the amount described in paragraph (3) plus the amount described in paragraph (4)).

Pursuant to the Act, § 226.8(c) of Regulation Z provides:

(c) *Credit sales* . . . the following items, as applicable, shall be disclosed:

(1) The cash price of the property or service purchased, using the term "cash price."

(2) The amount of the downpayment . . .

(3) The difference between the amounts described in subparagraphs (1) and (2) of this paragraph, using the term "unpaid balance of cash price."

(4) All other charges, individually itemized, which are included in the amount financed but which are not part of the finance charge.

(5) The sum of the amounts determined under subparagraphs (3) and (4) of this paragraph, using the term "unpaid balance."

(6) Any amounts required to be deducted under paragraph (e) of this section, using, as applicable, the terms "prepaid finance charge" and "required deposit balance," and, if both are applicable, the total of such items using the term "total prepaid finance charge and required deposit balance."

(7) The difference between the amounts determined under subparagraphs (5) and (6) of this paragraph, using the term "amount financed."

Pursuant to Regulation Z, the FRB distributed the pamphlet "What You Ought to Know About Regulation Z." It was upon this pamphlet that defendant and similarly situated creditors throughout the country relied in duplicating the format which appears on the instant contract from a model form in the pamphlet.

Neither party has cited the FTC Informal Staff Opinion Letter of July 21, 1971,[26] which addresses itself to "unpaid balance" as well as to the above described pamphlet as follows (CCH ¶ 30,705 at 66,308):

Failure to employ the term "unpaid balance" on the model form at page 22 of [the pamphlet] is an error of omission. The forms . . . were not introduced or relied upon for the proposition that "unpaid balance" is not a required disclosure where appropriate under the Regulation. . . . a required term must also be used to describe the same amount, whenever: (a) that required term is prescribed by the Regulation as descriptive of an amount which is the sum, product, or difference of two or more amounts, if the sum, product, or difference is itself required to be disclosed in that transaction; or (b) the required term is prescribed by the Regulation as descriptive of an amount required by the Regulation to be used in computing another amount itself required to be disclosed in that transaction. . . . The term "unpaid balance" is required

. . . because the Regulation describes the "unpaid balance" as the sum of the "unpaid balance of cash price" plus the total of all other charges not included in the finance charge, and requires disclosure of the "unpaid balance." The term "amount financed" is also required to describe [the same amount] because the Regulation requires the amount financed to be used in computing the "Annual Percentage Rate" . . . It is true that the consumer has the information required so long as the [same amount] is disclosed, and that amount is meaningfully described so long as either term "unpaid balance" or "amount financed" is employed. . . . However, the consumer, lawyer, scholar, or other interested persons who wish to compare the disclosures with the words of the Regulation for one purpose or another need the term "unpaid balance" to know that the proper amounts have been used in computing that amount and also need the term "amount financed" to determine which amount has been used in computing the "Annual Percentage Rate." Without disclosure of both amounts, one or the other of those two desired pieces of information will be left to a well educated guess. Therefore, the requirement to employ both terms is not, for legal accounting purposes, so redundant as it may appear for every day use by the consumer in the normal credit transaction.

The initial FRB staff opinion was contained in letter 213 of December 16, 1969.[27] The transaction there did not assess a finance charge, and therefore provided no annual percentage rate or any down pay-

---

**26.** *Id.,* ¶ 30,705. The Federal Trade Commission's role in the enforcement of the Act is set forth in 15 U.S.C.A. § 1607(c), headed, "Federal Trade Commission as overall enforcing agency", and specifying: (c) Except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to some other Government agency under subsection (a) of this section, the Federal Trade Commission shall enforce such requirements. . . . All of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the

Commission to enforce compliance by any person with the requirements imposed under this subchapter, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests in the Federal Trade Commission Act.

*See generally* FTC cease and desist orders issued pursuant to the Act in CCH Consumer Credit Guide Transfer Binder, Decisions 1969–1973; CCH Consumer Credit Guide New Developments Section (1973-present).

**27.** CCH Consumer Credit Guide Special Correspondence Transfer Binder ¶ 30,748.

ment. In effect, the transaction removed all sum or difference calculations described in the FTC letter justifying the required disclosures. Thus, "cash price", "unpaid balance of cash price", "unpaid balance", and "amount financed" were synonymous and the Board recommended the use of the term "cash price (amount financed)" to reflect that particular type of transaction.

FRB letter 536 of September 23, 1971,[28] dealt with proper terminology to be used when there were no "other charges" and no "prepaid finance charges" or "required deposit balances." The staff concluded that "amount financed" would be the same figure as "unpaid balance of cash price", and the "unpaid balance", and the latter term could appropriately be omitted.

Similarly, letter 740 of December 28, 1973,[29] concluded that in a transaction in which there were no finance charges or "other charges" assessed, a combination of the terms "unpaid balance of cash price", "unpaid balance", and "amount financed" was appropriate and elimination of some of the terms not applicable was recommended to the creditor.

Letter 842 of September 19, 1974,[30] concerns

.  .  . whether the term *unpaid balance* is a required disclosure  .  .  . where there are "other charges" but no prepaid finance charge or required deposit balance involved in the credit transactions. .  .  . We appreciate your view that the definition of the term *amount financed* leaves little doubt as to what it includes on a disclosure statement. However, use of the term *unpaid balance* does offer some assistance to the consumer in understanding the mathematical progression on the Truth in Lending disclosure statement. .  .  . we would advise

creditors to incorporate the term into disclosure statements, even though the disclosure statement illustrated on page 22 of the pamphlet *What You Ought to Know About Truth in Lending*, may indicate that such a disclosure may not be required in such circumstances.[31]

*Welmaker v. W. T. Grant Company*, 365 F.Supp. 531 (N.D.Ga.1972), in dealing with a disclosure statement which reflected separate itemized entries of property insurance and other insurance charges following the "unpaid balance of cash price" entry, held that Regulation Z, § 226.8(c)(5) mandated the use of the term "unpaid balance." To that defendant's contention that the phrase "as applicable" as used in the Act "dispels any idea of rigid adherence to specific terminology", the court relied on *Ratner v. Chemical Bank of New York*, 329 F.Supp. 270 (S.D.N.Y.1971).

Citing *Welmaker* and *Ratner, Mitchell v. Dixie Furniture Co.*, Civil No. 16503 (N.D.Ga. June 8, 1973), discounted the distinction urged by defendant that since there was no "prepaid finance charge" or "required deposit balance", the amount listed as "amount financed" would be identical to "unpaid balance", justifying the omission of "unpaid balance" as not applicable under § 226.8(c) of Regulation Z. *Mitchell* held that rigid adherence to the terms prescribed by Regulation Z facilitates the uniform terminology necessary for informed comparisons between various credit arrangements. The insertion of two entries, "time balance of existing contract" (reflecting incorporation of the balance of a previous closed-end transaction into the new transaction), and "refund of unearned interest charge" (from previous transaction) following the "unpaid balance of cash price", clearly necessitated a mathematical sum step which is the essence of itemized disclosures both in

---

**28.** *Id.,* ¶ 31,059.

**29.** 4 CCH Consumer Credit Guide ¶ 31,059.

**30.** *Id.*, at 31,164.

**31.** The court notes that all the above letters, including the FTC opinion, represent a completely homogenous (albeit confusing) series of opinions, none of which detracts from nor contradicts any other. The line of case authority cited by both plaintiff and defendant similarly provides no contradiction as to conclusions reached on given facts.

§ 1638(a) of the Act and § 226.8(c) of Regulation Z. The "amount financed", on the other hand, bore independent significance to a consumer as representative of the amount on which the finance charge and annual percentage rate would be based.

Originally cleaving to the *Mitchell* and *Welmaker* decisions, the special master in *Rolader v. Georgia Power Co.*, CCH Consumer Credit Guide ¶ 98,551, Civil No. 18818 (N.D.Ga. June 23, 1975), requested resubmission for reconsideration to resolve inconsistent recommendations after having submitted his opinion in *Ivey v. Atlanta Gas Light Company*, CCH Consumer Credit Guide ¶ 98,704, Civil No. C74–521A (N.D.Ga. 1974). His second *Rolader* recommendation of June 23, 1975,[32] conformed to his holding in *Ivey* that where the transaction involves no "other charges" under § 226.8(c)(4), the use of the term "unpaid balance" is not required on the disclosure statement. In these two decisions, FRB letter 536, *supra*, was accorded decisive weight. *Mitchell* and *Welmaker* were distinguished on their facts in that those cases involved transactions in which "other charges" appeared on the disclosure statement.

Plaintiff urges the holding in *Griggs v. Sharpe's Appliance Co.*, Civil No. 19122 (N.D.Ga. December 31, 1974), *aff'd per curiam*, 515 F.2d 1181 (5th Cir. 1975), in which, under *Welmaker* and *Mitchell* fact situations, the use of the term "combined balance" in place of "unpaid balance" was found a violation of the Act and Regulation Z, as compelling authority in the instant case. This court finds this unpersuasive, since careful analysis will show that the decision is based on a misuse of terminology rather than a reaffirmation of the underlying requirement of an "unpaid balance" entry.

*Ives v. W. T. Grant Co., supra,* affirmed the Connecticut district court in holding that *Welmaker* was conclusive authority in finding a violation of Connecticut Regulations § 26–395–7(c)(5), *cf.* 12 C.F.R. § 226.-8(c)(5), in the use of "amount financed" rather than "unpaid balance" in a disclosure statement identical to that used in *Welmaker*.

The clear distinction arrived at in both the FRB letters and case decisions is duplicated in the instant case. In the absence of "other charges" and "prepaid finance charges", the "unpaid balance" entry is "not applicable."

This court finds that although defendant's contract form provides for the itemization of "other charges" in item 6 of the Statement of Charges, no such itemization was made or mandated in the instant transaction. Under the provisions of the Act and Regulation Z as set forth above, and the interpretation of same by both FRB staff opinion and case decision, where there are no "other charges" or "prepaid finance charges", no sum step is involved from the "unpaid balance of cash price" to "amount financed." Under such circumstances, the "unpaid balance" entry is "not applicable" under Regulation Z.

Summary judgment is GRANTED defendant on this issue.

## CONCLUSION

Consistent with its rulings in this case, as indicated *supra,* the court GRANTS defendant's motion for summary judgment as to *all* issues herein. There being no factual issues then remaining, let final judgment be entered for defendant. Defendant will prepare the same.

---

**32.** Replacing opinion reported 4 CCH Consumer Credit Guide ¶ 98,684.